In re Karen Lee CAMILLI, Debtor.

**INDUSTRIAL COMMISSION OF ARIZONA, Appellant,**

v.

**Karen Lee CAMILLI, Appellee.**

No. 95–15928.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1996.

Decided Sept. 5, 1996.

Lawrence D. Hirsch, Hirsch Law Office, Phoenix, Arizona, for the appellant.

Russell A. Brown, Brown & Sunkin, Chandler, Arizona, for the appellee.

Before: HUG, Chief Judge, SCHROEDER and HAWKINS, Circuit Judges.

SCHROEDER, Circuit Judge:

The United States Bankruptcy Code establishes a priority for nondischargeable obligations owed by a debtor to a state that are in the nature of an "excise tax." 11 U.S.C. § 507(a)(8)(E). The statute in relevant part provides:

(a) The following expenses and claims have priority in the following order:

. . .

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

. . .

(E) an excise tax on—

(ii) ... a transaction occurring during the three years immediately preceding the date of the filing of the petition. . . .

11 U.S.C. § 507(a)(8)(E)(ii).

This case concerns a statutorily-imposed obligation of the debtor, Karen Camilli, to the Industrial Commission of Arizona (ICA) for workers' compensation benefits the Commission had to pay to one of Camilli's employees who was injured on the job. The ICA's obligation arose because Camilli had failed to obtain workers' compensation insurance in violation of state law. The sole issue is whether Camilli's debt to the ICA is a "tax" within the meaning of the Bankruptcy Code, and therefore nondischargeable.

A divided Bankruptcy Appellate Panel ("BAP") held that the obligation was not a "tax" but was instead a "fee" that was to be treated as any other dischargeable, unsecured debt. *In re Camilli,* 182 B.R. 247 (9th Cir. BAP 1995). The BAP majority decision reversed the decision of the Bankruptcy Court that had held the obligation nondischargeable as a tax.

■ The federal bankruptcy statutes do not define "tax," but the Supreme Court has made it clear that labels imposed by state law are not controlling. Rather, the Supreme Court has stated that taxes are "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *New York v. Feiring,* 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941).

The leading case in this circuit is *In re Lorber Industries of California,* 675 F.2d 1062 (9th Cir.1982), which refined that general principle by holding that to qualify as a tax, a debt must be (1) an involuntary pecuniary burden; (2) imposed by the state legislature; (3) for a public purpose; (4) under the police or taxing power. *Id.,* 675 F.2d at 1066. We dealt in *Lorber* with charges imposed for the individual use of a city's sewer system to dispose of hazardous waste materials. The sewer system, with its concomitant charges, was one of the options available to entities wishing to dispose of waste materials lawfully, and users received a permit to use the

sewer services in return for paying the charges. We characterized the obligation in *Lorber* as more akin to a contractual obligation, voluntarily incurred by the debtor, than to an "involuntary pecuniary burden" characteristic of a tax. *Id.,* 675 F.2d at 1067, n. 4.

In this case the debtor violated state law by failing to obtain workers' compensation insurance for her employees. Under Arizona law, such violation could not operate to deprive an employee of workers' compensation benefits. Thus, when one of Camilli's employees was injured at work, Arizona law required the statutorily-established Special Fund to pay the benefits and obtain a judgment lien on behalf of the ICA against the employer *for recoupment.* A.R.S. §§ 23–907, 23–1065.

■ In deciding whether such an obligation is a nondischargeable tax, or whether it is more in the nature of a contractual debt like the fee assessment in *Lorber,* a key consideration for the BAP was whether the obligation was voluntarily undertaken. The BAP majority concluded that the obligation was a voluntary one akin to acceptance of a contractual fee obligation, because in its view, Camilli made a "voluntary" decision to violate state law when she failed to insure her employees. Because we conclude that an obligation imposed by statute as a result of a violation of state law cannot, under the principles enunciated in *Lorber* and nearly universally accepted, constitute a contractual debt, we conclude that the BAP erred in reversing the Bankruptcy Court.

The BAP also rested its decision on the additional assumption that the Special Fund, which was owed reimbursement as a result of its own statutory obligation to pay benefits for defaulting employers, was in a position materially similar to private insurance carriers who may be owed unpaid premiums by employers in bankruptcy proceedings. The BAP majority decided that giving the obligation owed to the ICA a nondischargeable priority would discriminate against similarly situated private creditors. *See In re Suburban Motor Freight, Inc.,* 36 F.3d 484 (6th Cir.1994) (*Suburban II* ). We conclude, however, that private carriers who are owed

premiums established in insurance contracts are not similarly situated to the ICA's Special Fund because the Fund carries a unique burden imposed by the legislature in the exercise of its police power to protect employees injured on the job.

In order to provide a full understanding of the reasons for our decision, we first explain in some detail the operation of the Arizona workers' compensation system, and we then survey the legal authority dealing with similar issues concerning what is a "tax" under the Federal Bankruptcy Code.

## THE ARIZONA WORKERS' COMPENSATION SYSTEM

Fulfilling a mandate in the Arizona Constitution, Ariz. Const. Art. 18, § 8, the state legislature enacted a comprehensive workers' compensation scheme, codified at A.R.S. § 23–901 et seq. Employers must insure their workers against job-related injury or they risk civil and criminal sanctions. A.R.S. § 23–907.

Employers may buy workers' compensation insurance from the state or from authorized private providers or, by proving to the ICA their ability to pay timely compensation directly to their injured employees and by posting a substantial bond, they may self-insure. A.R.S. § 23–961. An employee's agreement to waive workers' compensation is generally void. A.R.S. § 23–1025.

Employees may trade workers' compensation coverage for the right to sue the employer. This election is made by affirmatively rejecting the provisions of the Workers' Compensation Law in writing. Ariz. Const. Art. 18 § 8; A.R.S. § 23–906. Employees who do not formally reject the Law's protections are conclusively presumed to have accepted them and to have disclaimed the right to sue for injuries resulting from negligence. A.R.S. § 23–906.

To ensure compensation for injured workers whose employers have failed to insure them, but who elect not to sue, the legisla-

ture established a Special Fund. A.R.S. § 23–1065.[1] The Special Fund, maintained by tax revenues, is administered by the ICA. A.R.S. § 23–1065. Payments to an injured employee from the Special Fund "act as a judgment against the employer." A.R.S. § 23–907. And "[j]udgments obtained in any action prosecuted by the [ICA] … under the authority of [the Workers' Compensation Law] … have the same priority against the assets of the employer as claims for taxes." A.R.S. § 23–933.

The Special Fund is maintained in part by a tax on all worker's compensation insurance premiums paid in Arizona, whether to the state or to a private insurer. A.R.S. § 23–1065. In addition, employers who qualify to self-insure pay into the Fund according to a formula. *Id.* Also helping maintain the Special Fund are sums the ICA recoups in actions like this one.

## PROCEDURAL HISTORY

Karen Camilli failed to insure employees of her now-defunct janitorial business, "Final Touch." After one of Camilli's staff, Barbara Kennedy, was injured at work in November 1989, Kennedy filed a claim for compensation with the ICA. The ICA paid Kennedy and obtained a judgment against Camilli pursuant to A.R.S. section 23–907.

When Camilli filed for bankruptcy in 1991, the ICA filed an objection to her Chapter 13 Plan, and sought priority status for its judgment against her. After Camilli's Chapter 13 petition was dismissed and a subsequent Chapter 7 petition filed, she filed a complaint to determine the dischargeability of her debt to the ICA pursuant to 11 U.S.C. § 523(a)(1). The ICA filed a timely answer, and the bankruptcy court ruled that the principal amount paid out of the Special Fund was an "excise tax" within the meaning of 11 U.S.C. § 507(a)(8)(E), and therefore not dischargeable in bankruptcy.

Camilli appealed, and the BAP reversed, holding that the debt was not a tax, which is in the nature of an assessment, because this

---

1. The Special Fund is different and separate from the State Compensation Fund, from which benefits are paid to injured workers whose employers have elected to purchase insurance from the state.

debt resulted from "Camilli's voluntary decision not to provide insurance." *In re Camilli*, 182 B.R. at 251. According to the BAP, the ICA's claim stemmed from its "implied voluntary contract with Camilli for subrogation of monies paid to [her] employees." *Id.* To grant priority to the ICA's claim, the BAP concluded, would be unfair to the private insurers who compete with the state to provide insurance, but who must "suffer along with the rest of the unsecured creditors" in bankruptcy. *Id.* The ICA timely appealed. We have jurisdiction under 28 U.S.C. §§ 158(c)(2) and 158(d).

## LEGAL ANALYSIS

Under this circuit's leading decision in *In re Lorber Industries of California, Inc.*, 675 F.2d 1062 (9th Cir.1982), an obligation owed to the state qualifies for priority as a "tax" under federal bankruptcy law only if it meets four separate requirements, three of which are not seriously disputed in this case. There is little or no question that the obligation was first, imposed by or under the authority of the legislature; second, for a public purpose; and third, imposed under the police power of the state in order to protect injured employees. The *Lorber* element about which the judges below disagreed in this case was whether the debt is an "involuntary" burden. In *Lorber*, the debtor owed the local sewer district charges for the debtor's use of the sewer system to discharge industrial waste. In holding that the obligation was contractual in nature rather than "involuntary," we stressed in *Lorber* that the obligation itself was not created by the statute authorizing imposition of the fees. *Id.* at 1067. Rather, the obligation was created by the debtor's voluntary act of using the system. *See id.* at 1067, n. 4.

Here, Camilli contends that her obligation is materially similar to that in *Lorber*, and the BAP majority agreed, holding that it was Camilli's "voluntary" decision not to purchase insurance that gave rise to this obligation. This holding is not, however, an accurate description of the legal effect of Camilli's failure to procure workers' compensation insurance in Arizona, even if that failure could be considered to be a "voluntary" act. The source of Camilli's obligation to repay the workers' compensation benefits in this case was not her failure to obtain insurance, but the statutorily-created obligation to reimburse the Special Fund once the Fund paid benefits to an uninsured employee. By contrast, in *Lorber* the event that triggered the charges was the voluntary use by the debtor of the sewer system. The obligation to repay the Fund in this case is thus the product of legislative fiat; at the time it arose, and the lien was established, it was wholly beyond the control of the debtor.

Moreover, we conclude that the failure of an employer to comply with the Arizona's Workers' Compensation Law should not be considered a "voluntary" act giving rise only to an implied contractual obligation like the obligation to pay sewer charges in *Lorber*. The legal duty to provide workers' compensation insurance for employees in Arizona is part of a complex system designed not merely to offset state expenditures, but to provide universal availability of workers' compensation benefits to employees in the state. We therefore hold that Camilli's obligation to the Special Fund meets the *Lorber* elements for qualifying as a "tax" under federal bankruptcy law.

Because we held in *Lorber* that the sewer user charges were not entitled to priority as a tax, we did not have occasion to consider whether the elements we discussed in that case would, in all circumstances, be sufficient to qualify an obligation as a tax. We did not decide whether they were merely necessary elements that, even if satisfied, might not be sufficient to qualify an obligation for priority. That issue has been addressed in subsequent decisions of the Sixth Circuit, handed down in the workers' compensation context, which we find instructive. *In re Suburban Motor Freight, Inc.*, 36 F.3d 484 (6th Cir.1994) (*Suburban II*); *In re Suburban Motor Freight, Inc.*, 998 F.2d 338 (6th Cir.1993) (*Suburban I*). The Sixth Circuit in these decisions concluded that the *Lorber* elements, if considered both necessary and sufficient to qualify an obligation as a "tax," would result in too many priorities of debts to the government over like claims of private creditors. The Sixth Circuit held that gov-

ernment entities should not be treated more favorably than private creditors with similar claims. *See Suburban II* at 488; *Suburban I* at 342.

In *Suburban I*, the Sixth Circuit considered the obligation of the debtor to pay premiums to the Ohio Bureau of Workers' Compensation. Under the Ohio workers' compensation scheme, unlike the Arizona workers' compensation scheme, all employers were required to pay premiums to the State Bureau of Workers' Compensation, and private insurance companies were not permitted to offer workers' compensation insurance. Central to the court's holding that the premium obligation was a "tax" was the fact that employers could have no similar obligations to a private carrier. Taking the view that the "public purpose" element enunciated in *Lorber,* standing alone, reached too broadly, the court refined *Lorber*'s "public purpose" criterion to require (1) that the pecuniary obligation be universally applicable to similarly situated entities; and (2) that according priority treatment to a government claim not disadvantage private creditors with like claims. *See Suburban I*, 998 F.2d at 342. Because the premium obligation to the state was, in Ohio, a universal obligation for all employers except self-insurers, and because according priority treatment to those claims did not disadvantage any private creditors with similar claims, *Suburban I* held that the premium obligations were a tax.

In *Suburban II*, however, the same court was faced with the Bureau's claim, not for premiums, but for reimbursement of payments made to workers' compensation claimants. The payments had been necessitated by Suburban's failure to pay premiums when it was a participant in the state insurance fund, and its failure to pay claims which arose when it was a self-insured employer. The Sixth Circuit decided that such claims for reimbursement did *not* qualify as a "tax" within the meaning of the Bankruptcy Code.

*Suburban II* dealt first with the state's claim for reimbursement of compensation payments it made when the debtor was a fund participant but had defaulted on its premium obligations. The court reasoned that, once it had held in *Suburban I* that the premium obligations themselves were entitled to priority as a tax, the court would not accord priority to the Bureau's claim for reimbursement as well. The Sixth Circuit concluded that allowing priority in bankruptcy for both premiums and claims payments would overcompensate the state without benefitting the general public.

*Suburban II* also dealt with claims for reimbursement brought about by Suburban's default on obligations to employees during the period when it was a declared self-insurer under the Ohio law. Again, relying on the specific provisions of Ohio law, the court noted that Ohio law required self-insurers to post a bond, and that sureties had contributed, along with the state's surplus fund, to compensate Suburban's injured employees when Suburban defaulted. To allow priority status to the state fund, the court concluded, would be unfair to private sureties.

The ICA's claims in this case are materially different from the Bureau's in *Suburban II*. First, the Arizona's workers' compensation scheme is not a state monopoly, so that premium obligations to the state would not be accorded tax priority as a universal obligation of all insured employers. Second, the ICA's Special Fund differs from Ohio's in that the ICA carries its statutorily-imposed burden alone. No private entity competes with the ICA to pay "insurance" claims for which no insurance has been bought. Thus, there are no private creditors with claims similar to the ICA's in bankruptcy proceedings.

Accordingly, the Sixth Circuit's decisions in *Suburban I* and *Suburban II* are fully consistent with our holding that the exclusive and universal obligation under Arizona law of the Special Fund to provide compensation to employees of uninsured employers is a "tax" entitled to priority under the Bankruptcy Code. Because the obligation in this case meets the four additional requirements set forth by the Sixth Circuit in *Suburban I,* as well as the criteria of *Lorber,* there is no need to decide whether the *Suburban I* requirements must be met in all cases.

Cases in other jurisdictions are also consistent with our decision today. The cases out

of states like Ohio, where workers' compensation insurance by the state is mandatory, and the state insurance system monopolistic, generally hold that premium obligations to the state scheme have priority "tax" status. *See, e.g., New Neighborhoods v. W. Va. Workers' Compensation Fund,* 886 F.2d 714 (4th Cir.1989); *In re Pan American Paper Mills, Inc.,* 618 F.2d 159, 162 (1st Cir.1980); *In re E.A. Nord Co., Inc.,* 75 B.R. 634 (Bankr.W.D.Wash.1987); *In re Int'l Automated Mach., Inc.,* 9 B.R. 575 (Bankr. N.D.Ohio 1981). Similarly, courts have given tax priority to mandatory "contributions" to state workers' or unemployment compensation funds. *See, e.g., Matter of Pierce,* 935 F.2d 709, 711 (5th Cir.1991); *In re William Akers, Jr. Co.,* 121 F.2d 846 (3rd Cir.1941); *In re Nail,* 163 B.R. 105 (Bankr.E.D.Mich. 1994); *In re Chateaugay Corp.,* 153 B.R. 632 (Bankr.S.D.N.Y.1993); *In re Continental Minerals Corp.,* 132 B.R. 757, 759 (Bankr. D.Nev.1991); *In re Ndosi,* 116 B.R. 687, 689 n. 1 (Bankr.D.Minn.1990).

For the foregoing reasons the decision of the Bankruptcy Appellate Panel is REVERSED and the matter is remanded with instructions to affirm the decision of the Bankruptcy Court.

REVERSED and REMANDED