In re Kathryn **BLIEMEISTER**, Debtor.

Kathryn Bliemeister, Plaintiff,

v.

Industrial Commission of
Arizona, Defendant.

Bankruptcy No. 98–13899–PHX–RJH.
Adversary No. 00–00019.

United States Bankruptcy Court,
D. Arizona.

Aug. 1, 2000.

Ronald J. Ellett, Phoenix, AZ, for debtor.

Tracy S. Essig, James S. Samuelson, Assistant Attorney General, Phoenix, AZ, for Industrial Commission of Arizona.

## OPINION

RANDOLPH J. HAINES, Bankruptcy Judge.

This case raises difficult issues of States' sovereign immunity and the date of a "transaction" that gives rise to an excise

tax that is nondischargeable if the transaction was within three years of the petition.

## Factual Background

Kathryn Bliemeister and her husband owned a mechanic's shop, which husband ran while Kathryn worked full time at another job. On October 8, 1993, husband hired Raymond Cole, Jr. to work at the shop, but within the first few hours of his employment he suffered an accident in which his finger was torn off. The Bliemeisters had not obtained workers' compensation insurance as required by Arizona Revised Statutes ("A.R.S.") § 23–961. Consequently Mr. Cole applied to the Industrial Commission of Arizona (the "Commission") for compensation for his injury and resulting medical expenses, pursuant to A.R.S. § 23–907(B).[1]

The Commission held a formal hearing on Cole's application on January 12, 1995, and the Administrative Law Judge issued a decision and award on March 24, 1995. That decision notified Mr. Cole that he was entitled to benefits under the Workers' Compensation Act, but did not determine the amount. The Bliemeisters were given an opportunity to contest whether Cole was an employee or was injured within the scope of his employment, and they requested that review. The decision was upheld on July 12, 1995, and the Bliemeisters did not appeal that decision.

On September 13, 1996, the Commission issued a Final Award in the amount of $9,273.22, including medical, compensation and permanent benefits for Mr. Cole, and an assessment of penalties against the Bliemeisters. They did not appeal.

An uninsured employer is liable to reimburse the Commission for benefits paid to an injured worker, plus a penalty of $500 or 10% of the benefits paid, whichever is greater, plus interest. A.R.S. §§ 23–907(C) and 44–1201. An uninsured employer may also be assessed additional penalties pursuant to A.R.S. §§ 907(F) and (G). Consequently on October 7, 1998, the Commission sent the Bliemeisters a letter demanding payment. The demand letter stated that the claim was entered on March 24, 1995. Kathryn Bliemeister ("Debtor") filed her chapter 7 petition on October 29, 1998. Sometime between the accident and the filing of her petition, she was divorced from her husband.

## Procedural Background

Debtor duly listed the Commission's claim among her unsecured debts, and included the Commission in the mailing list of her creditors. Although her schedules listed the Commission's claim as not entitled to any priority, the Commission took no action to dispute that status. Debtor received her discharge on February 10, 1999.

The Commission apparently persisted in its efforts to collect, so Debtor filed a complaint to determine the dischargeability of the Commission's claim, and had a summons issued to the Commission on January 13, 2000.[2] The Commission answered the complaint, and on February 11, 2000, filed a motion for summary judgment. Its motion argued that the Commission's claim constitutes an excise tax that is entitled to priority under Bankruptcy Code § 507(a)(8)(E)(ii), and therefore excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(A). There can be no dispute that the Commission's claim constitutes an excise tax, because the Ninth Circuit so held in *Industrial Comm'n of Arizona v. Camilli (In re Camilli)*, 94 F.3d 1330 (9th Cir.1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953, 136 L.Ed.2d 840 (1997). Rather, the issue is whether the excise tax falls within the three-year time period before the filing of the petition to qualify for such priority status.

---

1. The date of his application does not appear in the record.

2. Debtor initially filed a motion to determine the dischargeability of the Commission's claim, to which the Commission filed a limited response, objecting that the Debtor must proceed by a complaint pursuant to Federal Rule of Bankruptcy Procedure 4007.

Relying on *Waldo v. Montana Dept. of Labor and Indus. Uninsured Employers Fund (In re Waldo),* 186 B.R. 118 (Bankr. D.Mont.1995), *aff'd,* 108 F.3d 340 (9th Cir. 1997) (table case), the Commission argues that for purposes of the priority statute, the "transaction" giving rise to the Debtor's liability was the Commission's determination of the amount to be paid to the injured employee. The Commission's analysis is that the determination was made on September 13, 1996, less than three years prior to the October 29, 1998 petition date, therefore the claim qualifies for priority under 11 U.S.C. § 507(a)(8)(E)(ii).[3]

Debtor responded and filed a cross-motion for summary judgment. Debtor argued that the relevant date was March 24, 1995, when the determination of Cole's entitlement to benefits was made. Debtor further maintained that she had received a letter from the Commission stating that March 24, 1995 was the date that the determination became final, and that Debtor relied on this representation in deciding to file her chapter 7 petition, raising an estoppel argument.

Oral argument was heard on May 31, 2000. After extensive exploration of numerous issues, the Court requested supplemental briefing on (1) the nature of an excise tax, (2) the kinds of "transactions" that are subject to excise taxes, (3) case law addressing the dates of transactions that give rise to various excise taxes, and (4) any other decisions on the issue, whether published or not, including the status of *In re DeRoche,* 94–10496–PHX–CGC (Bankr.D.Ariz. March 27, 1998), *aff'd, DeRoche v. Industrial Comm'n (In re DeRoche),* 98–1270–PHX–EHC (D.Ariz. March 25, 1999), *appeal filed* May 25, 1999, which is currently awaiting oral argument before the Ninth Circuit.

Simultaneously with filing its supplemental brief on July 7, 2000, the Commission filed a motion to dismiss the complaint, raising for the first time immunity from suit pursuant to the Eleventh Amendment. The Commission relied on *Mitchell v. California Franchise Tax Bd. (In re Mitchell),* 209 F.3d 1111 (9th Cir. 2000), for the propositions that a dischargeability complaint constitutes a "suit" for Eleventh Amendment purposes,[4] that 11 U.S.C. § 106(a) is unconstitutional under *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("*Seminole*"), and therefore ineffective to abrogate the State's sovereign immunity, that the defense is jurisdictional in nature and therefore can be raised at any time, and that no state official was named in the dischargeability complaint so the case could not proceed under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

### Sovereign Immunity and Bankruptcy

The Ninth Circuit held in *Mitchell* that a dischargeability complaint constitutes a "suit" for Eleventh Amendment purposes. That is, it is the kind of bankruptcy proceeding to which a sovereign immunity defense can be raised, as distinguished from, for example, the entry of a discharge order, distinguishing *Texas v. Walker,* 142 F.3d 813, 820–22 (5th Cir.1998), *cert. denied,* 525 U.S. 1102, 119 S.Ct. 865, 142 L.Ed.2d 768 (1999). 209 F.3d at 1116. *Mitchell* also held that 11 U.S.C. § 106(a) is unconstitutional because it was not an effort to remedy violations of rights protected by the Fourteenth Amendment. 209 F.3d at 1119.

But what neither the Ninth Circuit nor the Supreme Court has yet determined in the post-*Seminole* era, however, is whether the Eleventh Amendment preserved states' sovereignty over the subject of bankruptcies. As will be seen, this re-

---

**3.** No "returns" are due with respect to injuries suffered by employees of uninsured employers, so 11 U.S.C. § 503(a)(8)(E)(i) has no application to this case.

**4.** The State's motion did not address the fact that it was a "suit" at the State's insistence. *See* footnote 2, *supra.*

quires a textual and historical analysis of the original Constitution and the framers' understanding of those areas where states surrendered their sovereignty. It is a relatively easy conclusion to reach that *if* the Eleventh Amendment preserved the states' sovereign immunity in bankruptcies, then it could not be abrogated by a mere Article I power that is subject to the later adopted Amendment. What is more difficult to determine, however, and which has not yet been addressed in any reported decision that has come to this Court's attention, is whether the original Constitution was intended to preserve states' sovereignty over the subject of bankruptcies. Both Congress, in 11 U.S.C. § 106, and the Ninth Circuit in *Mitchell*, simply *assumed* that Eleventh Amendment immunity applied to bankruptcy cases just the same as it applied to all other suits, but closer examination of decades of Supreme Court Eleventh Amendment jurisprudence suggests that assumption may not be sound. Consequently, that is the first question that must be addressed.

▓▓▓ For over a century now, the law has been that the scope of the Eleventh Amendment is not to be determined by its words. That was the holding of *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), and in the following 110 years, the Supreme Court has not deviated from that holding. Indeed, particularly in *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), the Court significantly expanded its approach. For that fundamental reason, simply because a proceeding constitutes a "suit" in the words of the Eleventh Amendment cannot be the final answer on the applicability of the defense. For that, as all of the Supreme Court's decisions since *Hans* have held, we must more closely examine the history of the adoption of the Eleventh Amendment and the intent of the framers of the Constitution. "These holdings reflect a settled doctrinal understanding, consistent with the views of the leading advocates of the Constitution's ratification,

that sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself." *Alden*, 119 S.Ct. at 2254.

### Sovereignty Over Bankruptcy Proceedings Was Ceded In the Original Constitution

▓▓▓ As clearly stated in *Alden*, the Eleventh Amendment did not create or confer sovereign immunity on the states, but rather merely corrected the error made in *Chisholm v. Georgia*, 2 U.S. 419, 2 Dall. 419, 1 L.Ed. 440 (1793). Consequently to determine the scope of sovereign immunity, we must look not to the language of the Eleventh Amendment, but to the structure of the original Constitution and, even more importantly, the historical understanding at the time when the Constitution was originally adopted of those areas where state sovereignty was retained and where it was surrendered. "The Court has been consistent in interpreting the adoption of the Eleventh Amendment as conclusive evidence 'that the decision in *Chisholm* was contrary to the well-understood meaning of the Constitution,' *Seminole Tribe*, 517 U.S. at 69, 116 S.Ct. 1114, 134 L.Ed.2d 252, and that the views expressed by Hamilton, Madison, and Marshall during the ratification debates, and by Justice Iredell in his dissenting opinion in *Chisholm*, reflect the original understanding of the Constitution." *Alden*, 119 S.Ct. at 2253, *citing Seminole, Hans, Principality of Monaco v. Mississippi*, 292 U.S. 313, 325, 54 S.Ct. 745, 78 L.Ed. 1282 (1934) and *Edelman v. Jordan*, 415 U.S. 651, 660, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). And of those interpretative sources, probably the single most important is Hamilton's analyses in *The Federalist Papers*, the most significant and often quoting being *Federalist No. 81*.

In *Federalist No. 81*, Hamilton stated that "Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the

states...." *The Federalist No. 81*, at 414 (Alexander Hamilton) (Buccaneer Books, 1992). Hamilton recognized that the Constitution, as originally adopted, contained various provisions under which the states waived their sovereign immunity by ceding it to the federal government.

The Supreme Court has consistently recognized that such exceptions exist and, because the effect of the adoption of the Eleventh Amendment was to restore the original understanding of the scope of the states' retained sovereignty, they continue to exist. Most recently, Justice Kennedy's extensive structural and historical analysis in *Alden* repeatedly recognized the existence of such original exceptions: "[A]s the Constitution's structure, and its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) *except as altered by the plan of the Convention* or certain constitutional Amendments." 119 S.Ct. at 2246–47 (emphasis added). "The Constitution never would have been ratified if the States and their courts were to be stripped of their sovereign authority *except as expressly provided by the Constitution itself.*" *Id.*, 119 S.Ct. at 2253 (emphasis added), *quoting Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 239, n. 2, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), *and citing Edelman*, 415 U.S. at 660, 94 S.Ct. 1347. Justice Kennedy's *Alden* opinion, like many previous cases, repeatedly quotes *Federalist No. 81* for the proposition that sovereign immunity was retained by the States except where surrendered in the original Constitution. *E.g.,* "There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.' *Ibid.* (quoting The Federalist No.

81, at 487)." *Alden,* 119 S.Ct. at 2255, *quoting Principality of Monaco,* 292 U.S. at 322–23, 54 S.Ct. 745, *and citing Seminole* and *Blatchford v. Native Village of Noatak and Circle Village,* 501 U.S. 775, 781, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).

Despite repeated acknowledgments of such exceptions to sovereign immunity in the original Constitution, the Supreme Court has not the opportunity to explore them. But they are not hard to find, since the same passage in *Federalist No. 81* that is so often quoted expressly points the way. In the very next sentence after the oft-quoted reference to "a surrender of this immunity in the plan of the convention," Hamilton states: "The circumstances which are necessary to produce an alienation of state sovereignty, were discussed in considering the article of taxation, and need not be repeated here." *The Federalist No. 81* at 414. The discussion of the taxation article he referenced was *Federalist No. 32,* which contained an extensive analysis of precisely where in the Constitution such surrenders of state sovereignty occurred, to make the point that no such surrender existed as to the states' power of taxation. An extensive quotation is necessary to appreciate the precision and comprehensiveness of Hamilton's analysis:

An entire consolidation of the States into one complete national sovereignty would imply an entire subordination of the parts; and whatever powers might remain in them would be altogether dependent on the general will. But as the plan of the Convention aims only at a partial Union or consolidation, the State Governments would clearly retain all the rights of sovereignty which they before had and which were not by that act *exclusively* delegated to the United States. This exclusive delegation or rather this alienation of State sovereignty would only exist in three cases; where the Constitution in express terms granted an exclusive authority to the

Union; where it granted in one instance an authority to the Union and in another prohibited the States from exercising the like authority; and where it granted an authority to the Union, to which a similar authority in the States would be absolutely and totally *contradictory* and *repugnant*.... These three cases of exclusive jurisdiction in the Federal Government may be exemplified by the following instances: The last clause but one in the 8th section of the 1st article provides expressly that Congress shall exercise *"exclusive legislation"* over the district to be appropriated as the seat of government. This answers to the first case. The first clause of the same section impowers Congress "to lay and collect taxes, duties, imposts and excises'" and the 2nd clause of the 10th section of the same article declares that *"no State shall* without the consent of Congress, *lay any imposts or duties on imports or exports* except for the purpose of executing its inspection laws." Hence would result an exclusive power in the Union to lay duties on imports and exports with the particular exception mentioned; but this power is abridged by another clause which declares that no tax or duty shall be laid on articles exported from any State; in consequence of which qualification it now only extends to the *duties on imports.* This answers to the second case. The third will be found in that clause, which declares that Congress shall have power "to establish an UNIFORM RULE of naturalization throughout the United States." This must necessarily be exclusive; because if each State had power to prescribe a DISTINCT RULE there could be no UNIFORM RULE.

*The Federalist No. 32*, at 152–53. (emphasis in original)

After noting that the federal taxation power is granted without any of these three means of limiting similar powers among the states, Hamilton concludes his argument by noting:

> there has been the most pointed care in those cases where it was deemed improper that the like authorities should reside in the States to insert negative clauses prohibiting the exercise of them by the States. The tenth section of the first article consists altogether of such provisions. This circumstance is a clear indication of the sense of the Convention, and furnishes a rule of interpretation out of the body of the act which justifies the position I have advanced, and refutes every hypothesis to the contrary.

*Id.* at 154–55.

The bankruptcy power is granted to the federal government by the very same clause that Hamilton used to exemplify the third method by which the Constitution alienates states' sovereignty, and contains the same word used to signify that limitation on states' sovereignty: "Congress shall have power ... To establish an uniform Rule of Naturalization, and uniform Laws on the subjects of Bankruptcies throughout the United States." U.S. Const. Art. I, Sect. 8, cl. 4. Thus according to the principal expositer of the Constitution, the States surrendered their sovereignty over the subject of bankruptcy.[5]

In fact, the bankruptcy clause implied an abrogation of states' sovereign immunity for the second of Hamilton's reasons as well as the third. The bankruptcy clause entails an ability to impair the obligations of contracts, a power which was expressly denied to the States by Art. I, sect. 10. *See Hanover Nat'l Bank v. Moyses,* 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902).

The implication is unmistakable. The people and the states agreed in the original plan of the convention that if Congress should elect to act on the subject of bankruptcies, the states surrendered their

---

**5.** Leonard H. Gerson, *A Bankruptcy Exception to Eleventh Amendment Immunity: Limiting the Seminole Tribe Doctrine,* 74 Am Bankr.L.J. 1, 11 (Winter 2000).

sovereign powers on the subject. And as Hamilton indicated, the framers had taken "the most pointed care" to specify the states' surrender of their sovereignty on these very few, carefully selected subjects. The states no more retained sovereign powers over bankruptcy laws than they did over naturalization.

This may seem odd, since the subject of bankruptcy does not seem to so inherently involve issues of sovereignty as does the subject of naturalization. But that is in fact true only from today's perspective, from which we tend to think of bankruptcy laws as primarily dealing with individuals, creditors and debtors, rather than with states. But that was not the case in 1789. At that time the topic of bankruptcy was very much at the heart of the concept of sovereignty.

For at least the preceding two centuries, the history of bankruptcy legislation in England was in essence continuous struggle over the power of the king, not only to tax his subjects but also to imprison those who did not pay their debts, and to seize the landholdings of traitors. Glenn, for example, recounts how the Statute of 13 Elizabeth, the fountainhead of fraudulent conveyance law, was in reality a development in the battle between the king's courts and the church's power, which particularly affected the king's power to punish, or threaten, disloyal noblemen. GARRARD GLENN, FRAUDULENT CONVEYANCES AND PRACTICES, Vol. 1, §§ 61–61c (rev. ed.1940)

And the issue of a discharge of debts was also profoundly bound up with the powers of the sovereign, rather than merely an issue between individual debtors and their creditors. At the time the Constitution was adopted, the bankruptcy discharge was understood as not merely a release from debts but more importantly a discharge from debtor's prison. It was a relatively recent invention in English bankruptcy law, and always controversial and highly political. The Statute of 4 Anne, adopted in 1705, is generally regarded as the statute that allowed the first discharge provision in a bankruptcy context. Even though its "primary purpose" "was to facilitate creditors' recoveries" by encouraging debtors to disclose their assets,[6] it was significantly cut back in the very next year by an amendment requiring 80% creditor approval to obtain the discharge.[7] And even the statute known for introducing the discharge was exceedingly harsh on fraudulent debtors, for whom it prescribed the death penalty.[8] This carrot and stick approach was continued in the Statute of 5 George, which was adopted in 1732 and was the bankruptcy law in effect at the time of the Constitutional Convention, and served as the model for America's first bankruptcy statute, the Bankruptcy Act of 1800.[9] At the constitutional convention Roger Sherman noted the English death penalty provision. *See Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 472, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982). In the colonies thousands of debtors were imprisoned, and while several states passed discharge provisions they were constitutionally suspect when applied to nonresident creditors.[10] Indeed, some states had passed private acts to relieve individual debtors, which raised sovereignty questions when applied to creditors from other states and undoubtedly led to the concern for uniformity. *Gibbons, supra.* Consequently bankruptcy law, and particularly the discharge, was very much an issue involved with states' sovereignty, because it was a limitation on the power of the sovereign to imprison debtors and punish traitors, or to

---

6. Charles Jordan Tabb, *The Historical Evolution of the Bankruptcy Discharge,* 65 AM.BANKR. L.J. 325, 337 (Spring 1991).

7. *Id.* at 339. Even prior to that limitation, it had been available only to traders and merchants, and only in involuntary proceedings.

8. *Id.* at 336.

9. *Id.* at 340.

10. *Id.* at 344–45.

grant individual relief. When the states agreed to a uniform federal rule, they had to understand that they were surrendering their sovereignty over the subject of bankruptcies.

Hamilton was not alone in recognizing that states' sovereign immunity was necessarily limited by certain express provisions of the Constitution. Such limitations were also referenced in Justice Iredell's dissent in *Chisholm*, which *Hans* relied on for its interpretation of the scope of the Eleventh Amendment: "Every State in the Union *in every instance where its sovereignty has not been delegated to the United States*, I consider to be as completely sovereign, as the United States are in respect to the powers surrendered." *Chisholm*, 2 U.S. at 435, 2 Dall. 419, 1 L.Ed. 440 (Iredell, J., dissenting) (emphasis added). Even after the uproar over *Chisholm* and the adoption of the Eleventh Amendment, Justice Marshall indicated in dictum that a suit would properly lie in one of those instances where Hamilton had concluded that sovereignty had been limited by the express terms of the original Constitution:

> It is declared that "no tax or duty shall be laid on articles exported from any state." Suppose a duty on the export of cotton, of tobacco, or of flour; and a suit instituted to recover it. Ought judgment to be rendered in such a case? Ought the judges to close their eyes on the constitution, and only see the law?

*Marbury v. Madison*, 5 U.S. 137, 179, 1 Cranch 137, 2 L.Ed. 60 (1803). And Marshall also noted that the bankruptcy clause in particular ceded more power to the federal government than the other enumerated powers: "The peculiar terms of the grant certainly deserve notice. Congress is not authorized merely to pass laws, the operation of which shall be uniform, but to *establish* uniform laws on the subject throughout the United States." *Sturges v. Crowninshield*, 17 U.S. 122, 4 Wheat. 122, 4 L.Ed. 529 (1819).

The Supreme Court has recognized that the uniformity requirement of the bankruptcy clause has constitutional significance and distinguishes the bankruptcy clause from the commerce clause. *Gibbons, supra.* And the Supreme Court has rejected arguments that States are not subject to the same requirements as other creditors in bankruptcy cases. *People of State of New York v. Irving Trust Co.*, 288 U.S. 329, 53 S.Ct. 389, 77 L.Ed. 815 (1933). But for present purposes it is not necessary to consider how a State's sovereign immunity defense to discharge would interfere with the requisite uniformity. *Compare Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 166 n. 9, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (variations among state laws on the permissibility of interest on interest cannot be permitted under the Bankruptcy Act) *with Hanover Nat'l Bank*, supra (varying exemptions under state law are permissible). That would misconstrue Hamilton's analysis. He did not conclude that states' sovereignty is limited only to the extent that it would produce a lack of uniformity, but rather that states had ceded sovereignty with respect to those subjects where the Constitution demanded uniformity. Indeed, it is because of that original understanding, which was restored by the Eleventh Amendment, that the Eleventh Amendment would not also override the uniformity requirement.

Since the bankruptcy clause is one of the provisions expressly identified by Hamilton as a provision in which States' sovereignty had been "surrendered" in the plan of the convention, and that conclusion was referenced in the same passage of *Federalist No. 82* that the Court has most frequently relied on for its interpretation of the scope of Eleventh Amendment immunity, sovereign immunity is not assertable in a bankruptcy case governed by federal law. Congress did not need to adopt 11 U.S.C. § 106, because the states' sovereignty had been abrogated in the original

Constitution once the federal government elected to enact bankruptcy laws.

### The *In Rem* Exception

 There is yet another reason why sovereign immunity may not apply here, because the present proceeding, while constituting a "suit," is a proceeding *in rem.* There is post-*Seminole* Supreme Court precedent holding that states' sovereign immunity does not extend to *in rem* proceedings. In *California and State Lands Comm'n v. Deep Sea Research, Inc.,* 523 U.S. 491, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998), the Court held that the *in rem* nature of suits in admiralty created an exception to Eleventh Amendment immunity.

The significance of this holding for bankruptcy cases, of course, is that the Court has always recognized the fundamental *in rem* nature of bankruptcy cases. *E.g., Gardner v. New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947) (the whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a res); *Hanover Nat'l Bank v. Moyses,* 186 U.S. at 192, 22 S.Ct. 857. It was this *in rem* nature of bankruptcy court jurisdiction that gave rise to the oft litigated issue of summary versus plenary jurisdiction under the Bankruptcy Act, and limited the power of courts exercising the bankruptcy jurisdiction to recover preferences and fraudulent conveyances where the defendant's possession and claim to ownership of the property transferred was more than "colorable." *See, e.g., Taubel–Scott–Kitzmiller Co. v. Fox,* 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770 (1924); *Heath v. Helmick,* 173 F.2d 157 (9th Cir.1949). Both the fundamental purpose of the Eleventh Amendment immunity and the essence of the concept of summary jurisdiction could preclude bankruptcy courts from entering judgments against states for affirmative monetary recovery. *See, e.g., United States v. Nordic Village, Inc.,* 503 U.S. 30, 38, 112 S.Ct. 1011, 1017, 117 L.Ed.2d 181 (1992) ("[W]e have never applied an *in rem* exception to the sovereign-immunity bar against monetary recovery, and have suggested no such exception exists."); *French v. Georgia Dep't of Revenue (In re ABEPP Acquisition Corp.),* 215 B.R. 513 (6th Cir. BAP 1997) (rejecting *in rem* exception to states' Eleventh Amendment immunity from trustee's suit to recover a transfer tax).

Although *Mitchell* held that an adversary proceeding to determine the dischargeability of a debt constitutes a "suit" for Eleventh Amendment purposes, it did not address the *in rem* nature of the proceeding, and did not consider the *Deep Sea Research* exception to sovereign immunity, so that issue appears to remain open in the Ninth Circuit. And *Deep Sea Research* expressly did not rely solely on the fact that it involved an admiralty action, because the Supreme Court had previously held that the Eleventh Amendment had some application in admiralty. *See, In re New York,* 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921). Instead, the opinion of the unanimous Court in *Deep Sea Research* hinged on the "important distinction" that the plaintiff "asserts rights to a res that is not in the possession of the State." 523 U.S. at 504, 118 S.Ct. 1464. If that is the determining distinction for Eleventh Amendment purposes, then it renders the Eleventh Amendment inapplicable to all bankruptcy proceedings that were formerly regarded as within the bankruptcy courts' summary jurisdiction, which includes discharge issues such as the one presently before this Court.

It was never doubted that discharge issues were within the bankruptcy courts' summary jurisdiction, *i.e.,* within the scope of their *in rem* jurisdiction. Bankruptcy Act § 2(12); *Bardes v. First Nat'l Bank of Hawarden,* 178 U.S. 524, 20 S.Ct. 1000, 44 L.Ed. 1175 (1900); *Huffman v. Perkinson (In re Harbour),* 840 F.2d 1165 (4th Cir. 1988), *cert. granted, judgment vacated,* 492 U.S. 913, 109 S.Ct. 3234, 106 L.Ed.2d 582 (1989) ("Section 2 of the Act conferred upon the courts of bankruptcy original jur-

isdiction at law and equity over proceedings under the Act, which included ... disputes over the bankrupt's discharge. This was considered summary jurisdiction."); *Smith v. Bandy (In re Bandy)*, 237 B.R. 661 (Bankr.E.D.Tenn.1999).

Since discharge issues have always been considered to be within bankruptcy courts' summary jurisdiction, they are within the scope of the bankruptcy courts' *in rem* jurisdiction, and the State here cannot claim to have possession of the *res*. Consequently this case falls within the *in rem* exception to Eleventh Amendment immunity recognized in *Deep Sea Research*,[11] and not within the exception to the exception addressed in *Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982) and *ABEPP, supra.*

### The State Waived Sovereign Immunity By Seeking Summary Judgment

■ Even if sovereign immunity is assertable as a defense to the discharge of tax obligations, it has been waived by the State in this case. Here, the State did not merely answer the complaint but affirmatively sought summary judgement. It participated in the hearing on its motion for summary judgement, where it undoubtedly hoped to receive a ruling in its favor on the merits. Instead, however, the Court expressed serious doubts about its interpretation of what was the "transaction" being taxed, and requested supplemental briefing. It was only when the State filed its supplemental brief on July 7 that it for the first time asserted sovereign immunity.

The Ninth Circuit has held that a state waives its sovereign immunity by not asserting it until the first day of trial. *Hill v. Blind Indus. and Servs. of Maryland*, 179 F.3d 754 (9th Cir.1999), *overruling*

*Mills Music, Inc. v. Arizona*, 591 F.2d 1278 (9th Cir.1979). Here, the state delayed its assertion effectively further than in *Hill*, because here the state moved for judgment in its favor and participated in a hearing on its motion, without raising the defense of sovereign immunity until after the Court requested further briefing. The Ninth Circuit anticipated and condemned just such tactics in *Hill:*

> By waiting until the first day of trial, [the State] hedged its bet on the trial's outcome.... If [the State] prevailed at trial, it could withdraw its motion and let the jury verdict stand. If [it] lost at trial, it could ask to have the verdict set aside on the ground that the action was barred by the Eleventh Amendment....

> Such conduct undermines the integrity of the judicial system. It also wastes judicial resources, burdens jurors and witnesses, and imposes substantial costs upon the litigants....

> A party may gain an improper advantage through this tactic even without waiting until the first day of trial. The ruling on a motion for summary judgment, or on pre-trial matters such as motions in limine, can signal the probable outcome of the case. The integrity of the judicial process is undermined if a party, unhappy with the trial court's rulings or anticipating defeat, can unilaterally void the entire proceeding and begin anew in a different forum.

179 F.3d at 756–57.

When the Court requested further briefing, it necessarily signaled that it was not convinced by the State's arguments on the merits. By then it was too late for the State to raise sovereign immunity for the first time, without undermining the integrity of the judicial process.[12] The State's

11. Gerson, *supra* note 5, at 27.

12. The State cannot argue that it was unaware of *Mitchell* at the time of oral argument on its motion for summary judgment on May 31. *Mitchell* had been decided more than a month earlier on April 21, 2000, and the State had participated in another case before this Court the decision of which included a citation to *Mitchell* on May 17. *In re Lenke*, 249 B.R. 1 (Bankr.D.Ariz.2000). The State also had to be aware of *Hill*'s holding, because it was quoted in *Mitchell*, 209 F.3d at 1118.

motion for summary judgment constituted a waiver of any sovereign immunity it might have asserted.

Whether because sovereign immunity does not apply in bankruptcy cases, or in the *in rem* aspects of bankruptcy cases, or because the State waived it here by seeking summary judgment on the merits, the State's motion to dismiss must be denied.

### The Transaction Was the Employment, Not the Award

■ Turning then to the merits, the issue is what is the "transaction" that is the subject of the workers' compensation "excise tax," for purposes of 11 U.S.C. § 507(a)(8)(E)(ii). In its supplemental brief, the State notes that the legislative history of § 507(a)(8)(E)(ii) suggests that by "excise tax" it was meant to include "sales taxes, estate and gift taxes, gasoline and special fuel taxes, and wagering and truck taxes." 124 Cong.Rec. H11, 113 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards). Industrial Commission's Supplemental Brief at 2–3. It also cites Black's Law Dictionary that an excise tax is a tax "imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege." *Id., citing* Black's Law Dictionary (6th ed.1990).

Yet when it argues for the applicable date of the transaction that begins the running of the three year statute of limitations of 11 U.S.C. § 507(a)(8)(E)(ii), the State argues for the date on which the Debtor's obligation to refund the Industrial Commission arose. Industrial Commission's Supplemental Brief at 4. In short, the State argues that "the 'transaction' is the assessment" of the repayment obligation, *i.e.,* the assessment of the tax.

While the State is undoubtedly correct that the Debtor did not have an obligation to refund the Industrial Commission until after it determined the amount of the injured worker's claim and paid it, that is not the date that is referenced in 11 U.S.C. § 507(a)(8)(E)(ii), which instead refers to the date of the "transaction" that is subject to the tax. There are several flaws in the State's argument that the transaction being taxed is the assessment of the tax.

First, if Congress had wanted the statute of limitations for excise taxes to run from the date of assessment, it certainly could have said so. For example, one of the statutes of limitations for income taxes runs from the date of assessment, as does the statute for property taxes. 11 U.S.C. §§ 507(a)(8)(A)(ii) and 507(a)(8)(B). Congress would have used the same language for the date of excise taxes had it intended that to be the applicable date.

Second, the assessment of the tax is not the transaction being taxed because it is not "the performance of an act, the engaging in an occupation, or the enjoyment of a privilege" by the taxpayer.[13] The obvious meaning of "transaction" in 11 U.S.C. § 507(a)(8)(E)(ii) is some act by the taxpayer, not some act by the taxing authority. For example, if we were considering an excise tax on a sale, the transaction would be the sale itself, not the date on which the tax becomes due to the state after the report of the sale is filed.

Third, the payment of benefits to the injured worker is not a transaction that the debtor even engaged in. It was instead a transaction engaged in by the State. It makes no sense to suggest that an excise tax can be imposed on an act of the State's. To be sure, the amount it pays determines the amount of the excise tax, but the transaction giving rise to the tax has to be something other than the State's determination of the amount.

Fourth, to equate the transaction with the assessment of the tax means that the act being taxed is the imposition of the tax. To avoid this absurd result, it is necessary that the "transaction" be some act by the

---

**13.** Only a tax collector could argue that its imposition of a tax is a "privilege" enjoyed by the taxpayer.

Debtor other than the State's tax assessment.

The only act of the Debtor's that could qualify as the transaction subject to the tax is the act of employing a worker who is injured while the employer is without workers' compensation insurance. Indeed, in the long process that ultimately results in the State's payment of benefits and attempt to recover them from the Debtor, this act of employment and injury without insurance is the only act that necessarily involves the Debtor. All of the rest of the process can occur solely between the State and the injured worker.

The State argues that "The debtor's obligation to repay was the triggering date in *Camilli* which started the running of the three-year period under § 507(a)(8)(E)(ii)." Industrial Commission's Supplemental Brief at 4. But *Camilli* did not so hold. *Camilli* did not at all address the three-year period under 11 U.S.C. § 507(a)(8)(E)(ii). The timing issue did not arise because in that case the bankruptcy was filed in less than two years after the injury, so the state's workers' compensation reimbursement claim would have been within the priority time period under any analysis. Rather, the only issue in *Camilli* was whether the Commission's claim was a tax or a fee. The Ninth Circuit found it to be a tax in large part because, by the time the liability was imposed, it did not involve a voluntary act by the debtor. It was solely for that purpose that the Court noted that the "source" of the obligation "was not her failure to obtain insurance, but the statutorily-created obligation to reimburse the Special Fund once the Fund paid benefits to an injured employee." 94 F.3d at 1333.[14] *Camilli* does not equate the legal source of the obligation with the transaction that is subject to the tax, nor did it have any occasion to do so.

The District Court opinion in *DeRoche* that is currently on appeal to the Ninth Circuit held that the transaction date is the date "when liability accrued and benefits paid to the claimant." *DeRoche v. Industrial Comm'n (In re DeRoche)*, No. CIV 98–1270–PHX–EHC, order at 8–9 (D.Ariz. March 25, 1999). The Arizona District Court relied on *Waldo, supra*, for its ruling. *Waldo* relied primarily on the fact that until benefits are paid, the debtor incurs no liability to the compensation fund. This is certainly correct, but does not answer whether the liability falls within or without the time period specified by 11 U.S.C. § 507(a)(8)(E)(ii), which refers to the transaction date rather than the assessment date. On that issue, the *Waldo* opinion simply *assumed* that the three year statute of limitations of § 507(a)(8)(E)(ii) could not begin to run until the debtor's liability arose, *i.e.*, when the State paid the benefits to the injured worker: "Only on that date did the assessment against Debtor become due, and only on that date did the three-year limitation clock of 11 U.S.C § 507(a)(8)(E)(ii) begin to run." 186 B.R. at 125. While in most cases that may be sound logic, it loses sight of the statutory language that starts the clock from the date of the transaction, not the date of assessment as with some other taxes. It also loses sight of the fact that under bankruptcy law, a claim is often deemed to arise long before liability accrues under state law, because bankruptcy law recognizes contingent claims. The State's argument here is nothing more that a revival of the much discredited sophistry of *Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.2d 332 (3rd Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), which held that no bankruptcy claim, not even a contingent claim, can arise until liability accrues under state law. That analysis was roundly

---

**14.** If such out-of-context quotes were governing, it could as well be argued that the Ninth Circuit decided today's issue in *Camilli* by stating that the "obligation arose because

Camilli had failed to obtain workers' compensation insurance in violation of state law." 94 F.3d at 1331.

criticized and rejected by commentators and every circuit that addressed it, because it would eliminate contingent claims from the Code. It was rejected by the Ninth Circuit in *California Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925 (9th Cir.1993). *Hassanally v. Republic Bank (In re Hassanally)*, 208 B.R. 46, 51–52 (9th Cir. BAP 1997) ("The foregoing authority presents a clear message that the right to payment or accrued state law claim test is no longer viable in the Ninth Circuit."). *Jensen* also holds that the date a claim arises for bankruptcy purposes should be determined by federal bankruptcy law, rather than state law, which also defeats the State's argument here that the date it decides to assess the tax is governing.

The State argues that interpreting the transaction to be the injury would mean that the State may have less than three years to collect such taxes. While true, this does not defeat the logic of the interpretation. Even in the authorities cited in the State's supplemental brief, Congress did not guarantee taxing authorities three years to collect taxes after they became due, but merely wanted to ensure that taxing authorities had "an opportunity to collect any taxes due," or a "fair opportunity to collect taxes due." *Waugh v. Internal Revenue Service (In re Waugh)*, 109 F.3d 489, 492–94 (8th Cir.), *cert. denied*, 522 U.S. 823, 118 S.Ct. 80, 139 L.Ed.2d 38 (1997); *Gurney v. Arizona Dep't of Revenue (In re Gurney)*, 192 B.R. 529 (9th Cir. BAP 1996). Here, the State has not made an argument that using the date of injury as the appropriate date of the transaction will deny it a "fair opportunity" to collect such taxes. Indeed, it admitted at oral argument that the injured employee has only one year in which to file a claim, Trans. of May 31, 2000, at 11. So the State will have two years after the filing of a claim for benefits to assess the employer's liability and attempt to collect it. The State has not shown that fails to provide it a fair opportunity to collect.

Such an argument would be difficult to make on these facts. The State has not explained what caused the more than two year delay between the Final Award on September 13, 1996 and its demand on the Debtor for reimbursement on October 7, 1998. Since the petition commencing this case was filed just 22 days after the State's demand letter, it would appear that the bankruptcy would have been filed in September or early October of 1996 if the State had promptly made its demand. Such a filing date would have been within three years of the date of injury, and well within three years of when the State learned of the claim.

### Conclusion

I conclude the "transaction" being taxed is the employee's injury while the employer lacked workers compensation coverage, not the imposition of the tax itself. That "transaction" was on October 8, 1993, more than three years prior to the filing of this case on October 29, 1998. Alternatively, the State argues that *Jensen* also requires that for the claim to arise the claimant must know of the transaction ultimately giving rise to liability. But if so that would move the "transaction" date ahead only to January 12, 1995, when the Commission first had a hearing on Cole's claim (and probably much before then, when the claim was actually filed), which was still more than three years prepetition. Either way, the "transaction" ultimately giving rise to the "excise tax" liability occurred more than three years prior to the filing of the petition commencing this case, so the claim is dischargeable, and has been discharged, pursuant to 11 U.S.C. § 507(a)(8)(E)(ii).