In re LTV STEEL COMPANY, INC., et al., Debtors.

No. 00–43866.

United States Bankruptcy Court, N.D. Ohio.

July 2, 2001.

Richard M. Cieri, Richard Werder, Kathleen B. Burke, Jones, Day, Reavis & Pogue, Cleveland, OH.

Jeffrey B. Ellman, Jones, Day, Reavis & Pogue, Columbus, OH.

Michael J. Vanselow, Asst. Attorney General, St. Paul, MN.

Clinton E. Cutler, Fredrickson Byron, P.A., Minneapolis, MN.

Paul M. Singer, Reed Smith LLP, Pittsburgh, PA.

James G. McLean, Manon McDonough & Lucas, P.C., Pittsburgh, PA.

Lisa G. Beckerman, Robert Stark, Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York City.

Donald M. Robiner, U.S. Trustee, Cleveland, OH.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Chief Judge.

This cause is before the Court on the motion of LTV Steel Company, Inc. and LTV Steel Mining Company ("LTV") seeking enforcement of the automatic stay and related injunctive relief. LTV's motion seeks relief against the following individuals: Matthew G. Smith, Commissioner of Revenue of the State of Minnesota ("Smith" or "Commissioner"), George K. Hoyum, Director, Special Taxes Division, Minnesota Department of Revenue ("Hoyum"), Donald H. Walsh, Manager, Minerals Tax Office, Minnesota Department of

Revenue ("Walsh") and Lynn C. Willenbring, Director, Minnesota Collection Enterprise, Minnesota Department of Revenue ("Willenbring") (collectively referred to as "Respondents"). LTV seeks an order finding that Respondents violated the automatic stay by filing tax liens on LTV's property, declaring the liens to be of no force and effect, ordering Respondents to remove the liens and enjoining Respondents from taking any further collection efforts against LTV. LTV also seeks an ancillary award of its costs and attorneys' fees pursuant to 11 U.S.C. § 362(h). Respondents have asserted various defenses, chief among which is that the Eleventh Amendment of the United States Constitution prohibits LTV from obtaining the requested relief. A hearing was held on this matter on April 10, 2001. Kathleen B. Burke, Esq. appeared on behalf of LTV. Michael J. Vanselow, Esq. and Clinton E. Cutler, Esq. appeared on behalf of Respondents. This is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052.

## DISCUSSION

### A. *Facts*

This taxing problem requires the Court to wrestle with several complex issues. There is no real dispute over the facts of this case. LTV is one of the largest manufacturers of wholly-integrated steel products in the United States. One of the assets owned by LTV is a taconite mine and related facilities located in Cook, Lake and St. Louis counties in Minnesota.[1] LTV and 47 of its subsidiaries filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code, on December 29, 2000. The taconite mine and its related facilities became part of LTV's bankruptcy estate when the petitions were filed. *See* 11 U.S.C. § 541.

In May 2000, prior to filing its petition for relief, LTV announced that it was going to cease operations at the taconite mine and close the facility in the summer of 2001. This schedule was accelerated by the filing of LTV's petition, however, and LTV ceased operations at the mine on January 5, 2001. LTV has also initiated procedures to close the mining facility.

The present controversy stems from post-petition actions taken by Respondents to collect what is referred to as the Minnesota taconite production tax. This tax is imposed by the State of Minnesota upon "taconite and iron sulphides, [sic] and upon the mining and quarrying thereof, and upon the production of iron ore concentrate therefrom, and upon the concentrate so produced ...." MINN. STAT. ANN. § 298.24(1)(a) (West 2000). This tax is calculated on the average tons of taconite produced during the current calendar year and the two previous years. MINN. STAT. ANN. § 298.24(1)(d) (West 2000). The tax for any given tax year is to be assessed by the Commissioner by February 15 of the following year, and the tax assessed must be paid by February 24. MINN. STAT. ANN. § 298.27 (West 2000). Assessed taxes are to be paid directly to six local counties and the Minnesota Iron Range Resources and Rehabilitation Board. *Id.*

Respondents are officials of the Minnesota Department of Revenue ("Department"), which is a taxing agency of the

---

1. Taconite is a fine-grained rock containing iron that is mined and shaped into small pellets. These pellets are melted down and mixed with other elements to form steel. The related facilities located at the mine include a taconite processing plant, a power plant, a loading dock, a railroad and various items of machinery and equipment.

State of Minnesota. On January 9, 2001, Hoyum mailed to LTV an official order of the Commissioner that established LTV's tax liability for the 2000 tax year. This order stated that LTV's 2000 tax liability equaled Fourteen Million Eight Hundred Eighty–Five Thousand Dollars ($14,885,-000.00). (LTV's Memorandum to Enforce Stay, Exhibit 1.) On January 10, 2001, Willenbring mailed a document to LTV entitled "Notice and Demand for Immediate Payment and Jeopardy Collection." (LTV's Memorandum to Enforce Stay, Exhibit 2.) The notice was in regard to LTV's taconite production tax liability for the year 2000, and stated that:

> The tax liability shown above has not been paid. Pursuant to the provisions of Minnesota Statute § 270.70, Subdivision 2, the Commissioner of Revenue has reason to believe that collection of this liability is in jeopardy.
>
> Therefore, payment of $14,885,000.00 is demanded. If this amount is not remitted immediately, collection action will be initiated with no further notice to you. This may include levying upon your bank account or other property.

*Id.*

Apparently, the Department interpreted the phrase "immediate payment" quite literally, for on January 10, 2001, the same day that Willenbring mailed the notice of jeopardy assessment to LTV, a Department agent filed tax liens against LTV's property in Cook, Lake and St. Louis counties. Minnesota law provides that any tax imposed by the Department becomes a lien upon all of a taxpayer's property, and the lien is perfected by filing a notice of lien in the office of the county recorder of the county in which the taxpayer's real property is located. Minn. Stat. Ann. § 270.69 (West 2000).

On January 12, 2001, a Department officer mailed a letter to LTV which explained that "because of the taxpayer's bankruptcy proceedings, the Department determined there was a substantially reduced possibility of ever collecting the taxpayer's $14,885,000.00 taconite production tax liability unless liens were filed as quickly as possible." (LTV's Memorandum to Enforce Stay, Exhibit 3.) On February 9, 2001, LTV's tax liability for the year 2000 was adjusted to Fourteen Million Eight Hundred Eighty–Nine Thousand Seven Hundred Thirty–Seven Dollars ($14,889,-737.00). (LTV's Memorandum to Enforce Stay, Exhibit 4.)

Not content with attempting to collect the tax due for the year 2000, Hoyum dispatched another order to LTV on January 23, 2001. This order established LTV's taconite production tax liability at Ten Million Ninety–Nine Thousand Seven Hundred Thirty–Nine Dollars ($10,099,-739.00) for the 2001 tax year, and Five Million Three Hundred Twenty–Three Thousand Eight Hundred Fifty Dollars ($5,323,850.00) for the 2002 tax year. (LTV's Memorandum to Enforce Stay, Exhibit 8.) These taxes were assessed despite the fact that LTV engaged in taconite mining activities for a grand total of five days in the 2001 tax year.

True to form, on January 23, 2001, a Department agent mailed to LTV a notice of jeopardy assessment and demand for immediate payment of the 2001 and 2002 taxes. (LTV's Memorandum to Enforce Stay, Exhibit 9.) On January 24, 2001, the Department filed tax liens covering these unpaid taxes in Cook, Lake and St. Louis counties. (LTV's Memorandum to Enforce Stay, Exhibit 10.) Neither Respondents nor the Department appear to have taken any further actions to collect any unpaid tax liabilities from LTV.

Not surprisingly, LTV strongly objects to Respondents' attempts to collect these taxes. LTV has initiated two separate

administrative appeals to the Commissioner challenging the two jeopardy collection notices and the perfection of the various tax liens. That action is still pending.

LTV contends that Respondents' acts of mailing the jeopardy collection notices and perfecting the tax liens on LTV's property constituted willful violations of the automatic stay imposed by 11 U.S.C. § 362(a). LTV asserts that these violations were willful because Respondents were aware that LTV had filed for bankruptcy at the time they took these actions. LTV seeks an order requiring Respondents to remove the liens filed against LTV's property, declaring the liens to be of no force and effect and enjoining Respondents from taking any further collection actions against LTV. LTV also seeks an award of costs and attorneys' fees pursuant to § 362(h).

Respondents have voiced several responses to LTV's arguments. First, Respondents argue that the Eleventh Amendment bars LTV's motion in its entirety because the State of Minnesota has not waived its sovereign immunity in this proceeding. Second, Respondents assert that the Court should abstain from hearing this motion because it presents complex and novel issues of state law that will be decided in LTV's appeal to the Commissioner. Third, Respondents contend that LTV's motion should be denied because it should have been filed as an adversary proceeding and not as a contested matter. Fourth, Respondents argue that the mailing of the collection notices and filing of the tax liens did not violate the automatic stay because they fall within the exceptions to the stay found in 11 U.S.C. § 362(b)(9)(D) and (18). Finally, Respondents assert that LTV is not entitled to an award of costs and attorneys' fees because § 362(h) applies only to individuals and not corporations.

## B. Issues

As the issues before the Court are numerous and complex, we shall first consider the procedural issues raised by Respondents because they will be easier to address and their disposition may have an effect on the substantive issues that are at the heart of this matter. Accordingly, we address the issues in the following order: 1) whether Fed. R. Bankr. P. 7001 requires LTV to bring the matter before the Court as an adversary proceeding; 2) whether LTV is entitled to an award of costs and attorneys' fees under § 362(h) if it succeeds on the merits; 3) whether the Eleventh Amendment to the United States Constitution prevents LTV from seeking relief against Respondents; 4) whether the Court should abstain from hearing the matter on the basis of comity and 5) whether Respondents' mailing of the collection notices and filing of the tax liens violated the automatic stay.

## C. Analysis

### 1. Adversary Proceeding or Contested Matter?

Respondents assert that LTV's motion should be denied because the various types of relief requested must be sought by adversary proceeding and not by contested motion. Specifically, Respondents argue that Fed. R. Bankr. P. 7001 requires that actions seeking declaratory or injunctive relief, the recovery of money or property, or determinations of the validity, priority and extent of liens must be initiated by way of an adversary proceeding. We find this argument to be without merit, however, as the Court has previously remarked that:

> Although Debtors' request is couched as a motion for an injunction, its thrust is to enforce the automatic stay. A motion is an appropriate method of bringing the issue before the Court. Because Debt-

ors are proceeding under § 362(a), they need not meet the more stringent requirements for the granting of a preliminary injunction of FED. R. CIV. P. 65. *In re Phar–Mor, Inc.*, 152 B.R. 924, 926 (Bankr.N.D.Ohio 1993).

The present motion before the Court is clearly intended to enforce the automatic stay. Accordingly, the Court concludes that LTV was not required to request relief in the form of an adversary proceeding.

### 2. Availability of Attorneys' Fees

■ Section 362(h) provides that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h). LTV contends that an award of costs and fees is appropriate in this instance because Respondents' violation of the stay was willful. Respondents argue that § 362(h) does not apply in this instance because LTV is a corporation and not an individual.

There is a division in the courts as to whether § 362(h) allows a corporation or other business entity to collect fees and costs for a violation of the stay. Earlier decisions allowed corporations to recover under § 362(h) on the basis that "it seems unlikely that Congress meant to give a remedy only to individual debtors against those who willfully violate the automatic stay provisions of the Code as opposed to debtors which are corporations or other like entities[,]" because such a conclusion would defeat the purpose of the automatic stay. *Budget Serv. Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir.1986). *See also Cuffee v. Atlantic Bus. & Cmty. Dev. Corp. (In re Atlantic Bus. & Cmty. Dev. Corp.)*, 901 F.2d 325, 329 (3rd. Cir. 1990).

However, more recent decisions unanimously reject the idea that § 362(h) ap-

plies to corporations. *See Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1552–53 (11th Cir. 1996); *Johnston Envtl. Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 619 (9th Cir. 1993); *Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 920 F.2d 183, 186–87 (2d. Cir. 1990). The common rationale behind these decisions is that the plain meaning of the term "individual," both in common parlance and in other provisions of the bankruptcy code, is of a natural person, and not a corporate entity. *Jove Eng'g*, 92 F.3d at 1550–51; *Goodman*, 991 F.2d at 619; *Chateaugay Corp.*, 920 F.2d at 185–86. This approach appears to have become the majority view on the subject. *See A & J Auto Sales, Inc. v. United States (In re A & J Auto Sales, Inc.)*, 223 B.R. 839, 844 (D.N.H.1998); *Consol. Rail Corp. v. Gallatin State Bank*, 173 B.R. 146, 147–48 (N.D.Ill.1992); *Manlon, Inc. v. Sanitation Dist. No. 1 (In re Manlon, Inc.)*, 168 B.R. 594, 597 (Bankr.E.D.Ky.1994).

■ Upon careful consideration of this issue, the Court determines that the reasoning of *Chateaugay Corp.* and its progeny is correct, and we conclude that the term "individual" contained in § 362(h) means only natural persons and not corporate entities. LTV is thus precluded from recovering costs and attorneys' fees under § 362(h). However, this does not mean that LTV lacks a remedy for a violation of the automatic stay, as it is clear that § 105(a) provides the Court with contempt powers that may be exercised to prevent or remedy violations of the stay, including an award of monetary relief. *Jove Eng'g*, 92 F.3d at 1554–55; *Goodman*, 991 F.2d at 620; *Chateaugay Corp.*, 920 F.2d at 187.

### 3. Eleventh Amendment Sovereign Immunity

This brings us to Respondents' principal defense, which is that the sovereign immu-

nity of Minnesota recognized by the Eleventh Amendment of the United States Constitution prevents LTV from seeking any relief against them in a federal forum. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.

█ Although on its face the Eleventh Amendment appears only to limit the diversity jurisdiction of the federal courts, the amendment's "language has been interpreted not literally, but broadly, in light of the historical context in which the Amendment was ratified." *Doe v. Wigginton,* 21 F.3d 733, 736 (6th Cir.1994). Thus, the Supreme Court has held that the Eleventh Amendment bars a citizen from suing his home state in federal court on the basis of federal question jurisdiction, *Hans v. La.,* 134 U.S. 1, 14–15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890); as well as preventing a citizen from asserting a federal claim against a state in the state courts, *Alden v. Me.,* 527 U.S. 706, 754, 119 S.Ct. 2240, 2266, 144 L.Ed.2d 636 (1999). The guiding principle behind the Court's sovereign immunity jurisprudence is that

> the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment. Rather, as the Constitution's structure, and its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of

the Constitution or certain constitutional Amendments.

*Alden,* 527 U.S. at 713, 119 S.Ct. at 2246–47.

█ There are, however, two circumstances in which a state's sovereign immunity may be circumvented. First, Congress may abrogate a state's sovereign immunity if it unequivocally expresses its intent to do so and acts pursuant to a valid exercise of power. *Seminole Tribe of Fla. v. Fla.,* 517 U.S. 44, 55, 116 S.Ct. 1114, 1123, 134 L.Ed.2d 252 (1996). The only power that Congress may use to abrogate state sovereign immunity is contained within § 5 of the Fourteenth Amendment. *Id.* at 65, 116 S.Ct. at 1128. Second, a state's sovereign immunity may be circumvented if the state expressly waives its sovereign immunity. *College Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 675–76, 119 S.Ct. 2219, 2226, 144 L.Ed.2d 605 (1999).

It is clear that Eleventh Amendment sovereign immunity extends to agencies of a state, and it is not contested that the Department is an agency of the State of Minnesota. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). Thus, Respondents argue that the Court cannot consider LTV's motion, as the State of Minnesota has not waived its immunity and because 11 U.S.C. § 106(a), which purports to abrogate the states' sovereign immunity in certain bankruptcy proceedings, was not enacted pursuant to a valid grant of authority.

█ It is widely accepted that § 106(a) is unconstitutional because it was not enacted pursuant to § 5 of the Fourteenth Amendment. *Mitchell v. Franchise Tax Bd. (In re Mitchell),* 209 F.3d 1111, 1120 (9th Cir.2000); *Sacred Heart Hosp. of Norristown v. Pa. (In re Sacred Heart*

*Hosp. of Norristown)*, 133 F.3d 237, 245 (3rd Cir.1998); *Dep't of Transp. & Dev. v. PNL Asset Mgmt. Co. LLC (In re Estate of Fernandez)*, 123 F.3d 241, 246 (5th Cir. 1997); *Schlossberg v. Md. (In re Creative Goldsmiths of Wash., D.C., Inc.)*, 119 F.3d 1140, 1147 (4th Cir.1997). While we concur that the abrogation of sovereign immunity contained in § 106(a) is invalid, we conclude that the Eleventh Amendment does not bar us from considering LTV's motion. We reach this conclusion because we believe that the relief requested by LTV falls within the exception to the Eleventh Amendment first expressed in *Ex parte Young*, 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908). The so-called *Young* doctrine establishes that "suits against state officers seeking equitable relief for ongoing violations of federal law are not barred by the Eleventh Amendment." *Telespectrum, Inc. v. Public Serv. Comm'n of Ky.*, 227 F.3d 414, 419 (6th Cir.2000). This doctrine is necessary "if the Constitution is to remain the supreme law of the land." *Alden*, 527 U.S. at 747, 119 S.Ct. at 2263.

The *Young* doctrine permits a suit to proceed against a state officer only when prospective injunctive relief is sought to remedy an ongoing violation of federal law. *Papasan v. Allain*, 478 U.S. 265, 277–78, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986); *Edelman v. Jordan*, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974). However, *Young* does not permit a retroactive award of monetary relief, even if it is equitable in nature, because such relief is indistinguishable from an award of money damages against the state. *Edelman*, 415 U.S. at 668, 94 S.Ct. at 1358. *Young* also does not permit relief to be granted in the form of a declaratory judgment that an officer's past actions were illegal if there is no continuing violation of federal law, *Green v. Mansour*, 474 U.S. 64, 73, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985); does not permit relief if the state is deemed to be the real party in interest, *Pennhurst*, 465 U.S. at 101, 104 S.Ct. at 908; and does not permit relief that is the functional equivalent of some form of retroactive relief that implicates special sovereignty interests, *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281, 117 S.Ct. 2028, 2040, 138 L.Ed.2d 438 (1997). Furthermore, injunctive relief under *Young* may not be available "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right[.]" *Seminole Tribe*, 517 U.S. at 74, 116 S.Ct. at 1132.

With this understanding of the *Young* doctrine in mind, there are five questions that we must address in order to determine if LTV's motion is barred by the Eleventh Amendment. These questions are: 1) does the motion seek relief against the state; 2) has Congress prescribed a detailed remedial scheme for the enforcement of the stay against a state; 3) is the relief requested in the form of an injunction or money damages; 4) does the requested relief seek to ameliorate a past or ongoing violation of federal law and 5) would the granting of the requested relief implicate special sovereignty interests of the State of Minnesota. The answer to the first two questions is clearly in LTV's favor, as LTV's motion seeks relief only against Respondents and not from the state itself, and because Congress has not developed a detailed remedial scheme for the enforcement of the stay against the states.[2] Answering the other questions, however, is not so easy.

---

**2.** We conclude that Congress has not provided a detailed remedial scheme for the enforcement of the stay against the states because § 362 contains only one provision,

■ Responding to the third question requires us to consider the nature of the relief requested by LTV. LTV's motion requests the following relief: 1) a finding that Respondents' actions in filing the tax liens violated the automatic stay; 2) declaring the liens to be of no force or effect; 3) ordering Respondents to remove the liens and 4) enjoining Respondents from taking any further actions to collect the unpaid taxes from LTV. LTV also seeks an award of costs and attorneys' fees as ancillary relief.

Setting aside the request for costs and fees, it is clear that LTV's motion does not seek relief in the form of money damages that would be paid from the state treasury. Rather, the relief requested merely seeks to restore the *status quo* and return the parties to the position they found themselves in before Respondents recorded the liens. While it could be argued that requiring Respondents to remove the liens may result in the state losing the right to realize the full value of the liens, and thus result in a loss of revenue to the state, we do not think such an occurrence is of the same character as requiring the state to pay monies to a private party to remedy a past wrong.

■ The liens at issue here are nothing more than security for an unpaid debt. They have not been liquidated by the state, nor transferred to a third party in exchange for a sum of money. As a result, an order requiring Respondents to remove the liens would not have a direct effect on the state treasury, because it would not require the state to transfer funds from its treasury to LTV. At best, removal of the liens would have only an indirect effect on the state treasury, be-

cause it may result in the state recovering less than the full amount of the debts that are secured by the liens. However, it is clear that the *Young* doctrine "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury." *Milliken v. Bradley,* 433 U.S. 267, 289, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977). *See also Papasan,* 478 U.S. at 278, 106 S.Ct. at 2940; *Quern v. Jordan,* 440 U.S. 332, 349, 99 S.Ct. 1139, 1149, 59 L.Ed.2d 358; *Edelman,* 415 U.S. at 667–68, 94 S.Ct. at 1357–58. The Supreme Court has thus made it clear that the costs of complying with a valid order does not transform permissible injunctive relief into an impermissible money judgment against the state.

We perceive three reasons why removal of the liens would not have the same effect as a money judgment against the state. First, and most important, is the fact that removal of the liens will not result in the nullification of LTV's tax liability. LTV will have to deal with these debts in its plan of reorganization, and, while the terms of a plan may not result in full payment of the debts, the state will receive at least some portion of the taxes owed to it. Second, it is not certain that payment of the taxes through a plan will result in any lesser recovery for the state than if the state foreclosed on the liens, for it is possible that any recovery from a foreclosure sale would be less than the total amount of the tax debt. Finally, we note that the tax debt is contingent in any event, for it is possible that LTV may succeed in its challenge to the Minnesota tax scheme, which may result in a substan-

---

§ 362(h), that specifically provides a remedy for violations of the stay. However, § 362(h) is not overly detailed, does not make any mention of actions against a state, does not

provide special procedures or remedies for actions against a state, and, as we have previously concluded, does not apply to corporate debtors.

tially lower tax liability. These considerations lead us to conclude that while the relief requested by LTV may have an ancillary effect on the state treasury, it is not a disguised money judgment against the state. Accordingly, the Court concludes that "this relief falls on the *Young* side of the Eleventh Amendment line rather than on the *Edelman* side." *Quern,* 440 U.S. at 347, 99 S.Ct. at 1148.

 Having concluded that the relief requested by LTV is in the nature of an injunction, we must now consider whether the relief, if granted, would remedy past or ongoing violations of federal law. Respondents argue that the *Young* doctrine is only applicable to prevent future violations of federal law, and not past or present ones. Respondents are not entirely correct, however, for it is clear that the *Young* doctrine permits injunctive relief to prevent future or *ongoing* (i.e.present) violations of federal law. *Papasan,* 478 U.S. at 277–78, 106 S.Ct. at 2940; *Mansour,* 474 U.S. at 68, 106 S.Ct. at 426; *Edelman,* 415 U.S. at 667–68, 94 S.Ct. at 1358. Indeed, the existence of a continuous, ongoing violation of federal law is necessary to invoke the *Young* exception. *Papasan,* 478 U.S. at 277–78, 106 S.Ct. at 2940; *Edelman,* 415 U.S. at 664, 94 S.Ct. at 1356.

We do not think it subject to dispute that an order enjoining Respondents from taking future collection efforts against LTV is entirely prospective and thus fits within the *Young* exception. The thornier question is whether an order requiring Respondents to remove the tax liens would be in the nature of prospective or retroactive relief. This question is a very close call, but ultimately we conclude that an order requiring the removal of the liens would be prospective and not retroactive in nature. We reach this conclusion for two reasons.

First, we find that although Respondents' acts of recording the liens occurred at a definite point in the past, the effect of the liens is continuous and ongoing, and, if the recording of the liens violated the stay, their mere existence constitutes an ongoing violation of federal law. We think this situation is analogous to that found in *Telespectrum, Inc. v. Public Serv. Comm'n of Ky.,* 227 F.3d 414 (6th Cir.2000). In *Telespectrum,* the plaintiff applied to the Public Service Commission of Kentucky for a certificate of public convenience and necessity to construct a 199 foot tall telecommunications tower. After a hearing, the commission denied the application and ordered plaintiff to find an alternate site to construct the tower. Plaintiff filed suit against the commissioners in district court, seeking an injunction ordering them to issue the certificate because their refusal to do so violated federal law. The district court granted summary judgment for plaintiff and ordered the commissioners to issue the certificate. *Id.* at 417–19.

The commissioners appealed to the Sixth Circuit Court of Appeals, arguing that the Eleventh Amendment prohibited plaintiff from suing them in federal court. The appellate court rejected this argument, stating that *Young* authorized the suit against the commissioners because it sought prospective relief. *Id.* at 419–20. The court stated that:

> In this case, Telespectrum is seeking an order to direct the Commissioners (in their official capacity) to issue the necessary authorizations permitting it to construct the tower. Telespectrum is not seeking compensation for lost profits; it is claiming that by failing to grant the application, the Commissioners are continuing to violate [federal law].

*Id.* at 420.

The lesson of *Telespectrum* is that certain unlawful actions taken in the past may

nevertheless give rise to ongoing violations of federal law, and that injunctive relief ordering an undoing of the prior unlawful act falls under the *Young* exception. This lesson is not unique to *Telespectrum*, and has long been recognized by the courts. *See Papasan*, 478 U.S. at 282, 106 S.Ct. at 2942 (present disparity in distribution by state of benefits of state's school lands constitutes an ongoing violation of federal law even though such disparity arose from actions taken more than a century in the past); *Milliken*, 433 U.S. at 289–90, 97 S.Ct. at 2762 (past acts of Detroit Board of Education that resulted in unlawful segregated school system resulted in continuing violation of federal law that could be enjoined by prospective relief). Because the liens continue to have effect until they are removed or foreclosed, we conclude that if the liens were recorded in violation of the stay, then they constitute a present, ongoing violation of federal law.

We also find the *Young* exception to be applicable because LTV's request for an order to remove the liens is one for prospective relief. This is true because such an order would only require Respondents to conform their future conduct to federal law and because it would not require the payment of money from the state treasury. *See Edelman*, 415 U.S. at 663–64, 94 S.Ct. at 1356. Other bankruptcy courts have found the *Young* exception to be applicable in similar circumstances. *See Wilson v. Cumis Ins. Soc'y, Inc (In re Wilson)*, 246 B.R. 600, 603–04 (Bankr.E.D.Ark.2000) (finding adversary proceeding seeking to enjoin probation revocation proceeding until dischargeability of restitution debt was determined to be one seeking prospective relief); *Alston v. State Bd. of Med. Exam'rs of S.C. (In re Alston)*, 236 B.R. 214, 217–18 (Bankr.D.S.C.1999) (allowing adversary proceeding seeking to enjoin enforcement of order suspending debtor's medical license to proceed pursuant to

*Young* ); *Kidd v. Driver Control Section Dep't of Fin. & Admin. (In re Kidd)*, 227 B.R. 161, 162–63 (Bankr.E.D.Ark.1998) (allowing adversary proceeding seeking order requiring state officer to return debtor's driver's license that was allegedly revoked in violation of §§ 524 and 525 to proceed); *Kish v. Verniero (In re Kish)*, 221 B.R. 118, 136–37 (Bankr.D.N.J.1998) (finding suit seeking to enjoin state officer from seeking to collect surcharge debt that was discharged in debtor's bankruptcy case can proceed under *Young* exception).

We think the cases referred to above are easily distinguishable from those cited by Respondents. For example, *Pitts v. Ohio Dep't of Taxation (In re Pitts)*, 241 B.R. 862 (Bankr.N.D.Ohio 1999) is inapplicable because the debtor initiated an adversary proceeding against an arm of the state and not against a state officer. *Id.* at 870–71. *In re Lush Lawns, Inc.*, 203 B.R. 418 (Bankr.N.D.Ohio 1996) is also inapplicable because the debtor's motion seeking to hold the State of Ohio in contempt for violating the automatic stay named the state as a party and thus the debtor did not even attempt to invoke the *Young* exception. *Id.* at 418. In summary, then, because LTV seeks prospective injunctive relief to correct an alleged ongoing violation of federal law, LTV's motion falls within the exception recognized by *Young*.

■ The final issue that we must consider is whether granting the requested relief would implicate special sovereignty interests of the State of Minnesota. Respondents have not addressed this point in their response to LTV's motion, but, nevertheless, it merits our attention. This focus upon special sovereignty interests stems from the Court's decision in *Coeur d'Alene*, 521 U.S. at 261, 117 S.Ct. at 2028. In this case, the Coeur d'Alene Tribe sued various state officials, claiming that the

Tribe owned the lands submerged beneath Lake Coeur d'Alene, a body of water that was regulated by the State of Idaho. The Tribe's lawsuit sought a declaratory judgment to establish its right to exclusive use and occupancy of the submerged lands as well as establishing the invalidity of all state laws that regulated or affected the submerged lands. The Tribe also sought a permanent injunction prohibiting the state officials from taking any action to regulate the Tribe's use of the submerged lands: *Id.* at 264–65, 117 S.Ct. at 2032.

The Court held that the Eleventh Amendment barred the Tribe's suit, even though the requested relief appeared to fit within the *Young* exception. *Id.* at 288, 117 S.Ct. at 2043. The Court reached this conclusion because it recognized that "this case is unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests." *Id.* at 281, 117 S.Ct. at 2040. The Court noted that if the requested relief was granted,

> substantially all benefits of ownership and control [over the lands] would shift from the State to the Tribe. This is especially troubling when coupled with the far-reaching and invasive relief the Tribe seeks, relief with consequences going well beyond the typical stakes in a real property quiet title action. The suit seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the State. The requested injunctive relief would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters. The suit would diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed by the State to be an integral part of its territory. To pass this off as a judgment causing little or no offense to Idaho's sovereign authority and its

standing in the Union would be to ignore the realities of the relief the Tribe demands.

*Id.* at 282, 117 S.Ct. at 2040.

We read *Coeur d'Alene* to stand for the proposition that some forms of prospective, injunctive relief may be so intrusive into a state's sovereignty that it is just as offensive as a money judgment levied against the state treasury, and are thus barred by the Eleventh Amendment. Unfortunately, the Court did not establish any clear guidelines as to when injunctive relief crosses the Eleventh Amendment line. However, it appears that the crucial problem with the relief requested in *Coeur d'Alene* was that it would permanently deprive the state of its power to control a particular subject matter (i.e., the submerged lands). The lesson of *Coeur d'Alene*, then, is that injunctive relief that obliterates a state's ability to regulate a field over which it has control is barred by the Eleventh Amendment.

With this understanding in mind, we consider whether the relief requested by LTV would implicate special sovereignty interests of the State of Minnesota. Because the requested relief challenges Respondents' lien imposition actions to collect a tax liability, the relief may arguably implicate the state's interest in collecting tax revenues. The field of tax collection is surely of special interest to the State of Minnesota, as it is necessary to fund the state treasury. However, we do not think that the relief requested here is so invasive of Minnesota's tax collection efforts as to cross the Eleventh Amendment line. Granting the relief requested by LTV will not invalidate the tax, will not prohibit the state from levying this particular tax against other entities in the future, will not require the state to relinquish possession and control over any real property and will

not deprive the state of its ability to pass laws regarding the assessment of taxes in the future.

Furthermore, the requested relief will not even deprive the state of its ability to ultimately collect all or some portion of the tax from LTV, as the state will be entitled to share in distributions from LTV's estate. The only indignity that the state can be said to suffer is that it will have to wait in line with all of LTV's other creditors before it can collect its debt. We do not think this implicates any special sovereignty interest of the state, as the Eleventh Amendment was intended to provide protection to the states to the extent that they were debtors, not creditors. *See generally, Alden,* 527 U.S. at 716–19, 119 S.Ct. at 2248–49; *Nev. v. Hall,* 440 U.S. 410, 418–19, 99 S.Ct. 1182, 1187, 59 L.Ed.2d 416 (1979); *Hans,* 134 U.S. at 12–14, 10 S.Ct. at 506–07. This observation is especially relevant here, for Respondents' actions effectively transform the state from an unsecured creditor into a secured creditor. This allows the state to jump ahead of LTV's other unsecured creditors and entitles it to a greater share of any distribution from the estate. Such an action is unfair to the other unsecured creditors in this case and is not permitted by the Bankruptcy Code. *See* 11 U.S.C. §§ 362(a); 1123; 1129.

■ Moreover, the Supreme Court has consistently recognized that a state's sovereign immunity does not exempt it from the operation of the bankruptcy laws. Thus it has been held that a bankruptcy court has authority to sell property free and clear of a state tax lien, *Van Huffel v. Harkelrode,* 284 U.S. 225, 227–28, 52 S.Ct. 115, 116, 76 L.Ed. 256 (1931); that a state's sovereign immunity does not prohibit a bankruptcy court from disallowing a claim for state franchise taxes because they were filed after the claims bar date,

*People of State of N.Y. v. Irving Trust Co.,* 288 U.S. 329, 333, 53 S.Ct. 389, 391, 77 L.Ed. 815 (1933); and that a state's sovereign immunity does not prevent a bankruptcy court from considering an objection to a claim for unpaid state taxes as well as determining the validity of liens securing the tax liability, *Gardner v. N.J.,* 329 U.S. 565, 578, 67 S.Ct. 467, 474, 91 L.Ed. 504 (1947). As the Court stated in *Gardner:*

> If the reorganization court lacked the power to deal with tax liens of a State, the assertion by a State of a lien would pull out chunks of an estate from the reorganization court and transfer a part of the struggle over the corpus into tax bureaus and other state tribunals. That would ... seriously impair the power of the court to administer the estate and adversely affect the power of the ... court to promulgate a reorganization plan.... It is the exclusive jurisdiction of the reorganization court which gives it power to preserve the railway as a unit and as a going concern and to prevent it from being divided up and dismembered piece-meal. Only in that way can continuous operation of the [debtor] be assured and a plan of reorganization be effected which not only safeguards the interests of the various claimants but is also compatible with the public interest.

*Id.* at 577, 67 S.Ct. at 473–74 (citations omitted). *See also Va. v. Collins (In re Collins),* 173 F.3d 924, 929–31 (4th Cir. 1999), *cert. denied,* 528 U.S. 1079, 120 S.Ct. 785, 145 L.Ed.2d 663 (2000) (holding that adversary proceeding seeking to determine dischargeability of debt owed to a state is not a suit against the state for Eleventh Amendment purposes); *Tex. v. Walker,* 142 F.3d 813, 821–23 (5th Cir. 1998), *cert. denied,* 525 U.S. 1102, 119 S.Ct. 865, 142 L.Ed.2d 768 (1999) (holding that Eleventh Amendment does not prevent the

discharge of a debt owed to a state); *State of Md. v. Antonelli Creditors' Liquidating Trust,* 123 F.3d 777, 786–87 (4th Cir.1997) (holding that Eleventh Amendment does not prohibit bankruptcy court from confirming plan of reorganization that is binding on a state).

■ Our analysis of this issue leads us to conclude that the Eleventh Amendment was intended to be used as a shield and not a sword. Accordingly, the Court concludes that the relief requested by LTV is authorized by *Young,* and does not constitute a suit against the State of Minnesota.

### 4. Abstention

■ We now turn our attention to Respondents' argument that we should abstain from deciding LTV's motion pursuant to 28 U.S.C. § 1334(c)(1). This section provides that "[n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1). Respondents contend that abstention is appropriate because resolution of this matter involves complex and novel issues of Minnesota tax law that will be decided in LTV's pending challenge to the assessment of the taconite production tax.

Abstention under § 1334(c)(1) is discretionary, not mandatory. *Lindsey v. Dow Chem. Co. (In re Dow Chem. Co.),* 113 F.3d 565, 570 (6th Cir.1997). Although no clear standard exists that delineates the circumstances in which discretionary abstention is appropriate, there is a general consensus that abstention may be appropriate in cases involving unique, unsettled or difficult issues of state law. *Id.* at 571. *See also In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 6 F.3d 1184, 1190

(7th Cir.1993). Additionally, some courts have exercised their discretion to abstain from hearing tax disputes. *See Zack v. United States,* 224 B.R. 601, 605–06 (E.D.Mich.1998); *Williams v. United States (In re Williams),* 209 B.R. 584, 584–85 (Bankr.D.R.I.1997); *Bldg. Techs. Corp. v. City of Hannibal (In re Bldg. Techs. Corp.),* 167 B.R. 853, 858 (Bankr.S.D.Ohio 1994). These cases are not fully relevant here, however, as they revolve around the existence of identical proceedings in state and bankruptcy courts, *Zack,* 224 B.R. at 604, or the recognition that the outcome of the dispute would have little or no effect on the estate, *Williams,* 209 B.R. at 585; *Bldg. Techs. Corp.,* 167 B.R. at 858.

Based on a careful review of the record before us, the Court declines to exercise its discretion to abstain from hearing this matter. We reach this conclusion because it is clear that the question of whether Respondents violated the automatic stay involves issues of federal bankruptcy law, and, as will be made clear below, this question may be addressed without reference to state law. Furthermore, even if reference to state law is necessary to resolve this motion, hearing the matter in this forum will serve the interests of justice and judicial economy by bringing all of the relevant issues within the purview of one court. This is especially important since the issues raised in LTV's motion will have a significant impact on the estate and creditors of the estate, which highlights the importance of having this matter resolved quickly, efficiently, and in consideration of applicable bankruptcy law.

### 5. Exception to the Automatic Stay under § 362(b)(9)(D)

■ 11 U.S.C. § 362(b)(9)(D) provides an exception to the automatic stay for the "making of an assessment for any tax and issuance of a notice and demand for payment . . . ." Respondents argue that

their mailing of collection notices and demands for payment were not subject to the stay by virtue of this exception. To the extent that these mailings were notices of a tax deficiency, they were indeed not subject to the stay pursuant to § 362(b)(9)(D). However, § 362(b)(9) does not allow a taxing authority to threaten the seizure of a debtor's property. *In re Shealy*, 90 B.R. 176, 179 (Bankr.W.D.N.C. 1988) (finding notice letters which threatened seizure of accounts and distraint rose to the level of an effort to collect the debt violated the stay); *In re Layton*, 220 B.R. 508, 516 (Bankr.N.D.N.Y.1998) (letters containing threat to foreclose violated stay as they did not merely provide notice); *Covington v. I.R.S.* (*In re Covington* ), 256 B.R. 463, 466 (Bankr.D.S.C.2000) (finding stay violation in letters entitled "Notice of Intent to Levy—You Must Respond Now.").

Here, Respondents informed LTV that "[i]f this amount is not remitted immediately, collection action will be initiated with no further notice to you. This may include levying upon your bank account or other property." (LTV's Memorandum to Enforce Stay, Exhibit 2.) Respondents subsequently informed LTV that "[i]mmediate payment of $15,423,589.00 is demanded. If not paid, tax liens will be filed against you, copies of which are enclosed." (LTV's Memorandum to Enforce Stay, Exhibit 9.) To the extent that these collection notices threatened seizure of LTV's property, they were not exempted from the automatic stay.

■ However, the mailing of these notices occurred wholly in the past. Thus, the notices themselves (as opposed to the liens) do not constitute an ongoing violation of federal law. Consequently, the

Eleventh Amendment bars the Court from ordering a remedy for the mailing of the notices. *See Mansour*, 474 U.S. at 68, 106 S.Ct. at 426.

### 6. Exception to the Automatic Stay under § 362(b)(18)

Respondents claim that the exception to the automatic stay provided by 11 U.S.C. § 362(b)(18) "clearly authorizes" their mailing of collection notices and filing of liens. 11 U.S.C. § 362(b)(18) states that there is an exception to the automatic stay: "under subsection (a) of the creation or perfection of a statutory lien for an ad valorem property tax imposed by the District of Columbia, or a political subdivision of a State, if such tax comes due after the filing of the petition." 11 U.S.C. § 362(b)(18).

■ There are two glaring errors in Respondents' interpretation of 11 U.S.C. § 362(b)(18). Both of these errors involve Respondents' apparent misunderstanding of the definition of key terms in the statute. First, Respondents evince a complete misunderstanding of the term "political subdivision of a State." The only entities that 11 U.S.C. § 362(b)(18) excepts from the automatic stay are "the District of Columbia" and those entities that are "*a political subdivision of a State.*" (emphasis added). Here, Respondents are all officials employed by the Department, which is an agency of the State of Minnesota. The Department is not a political subdivision of a state. Neither of these two terms are defined in the Code itself.

■ "The definition of words in federal statutes should be defined as a matter of federal law." *Leefers v. Anderson (In re Leefers)*, 101 B.R. 24, 25 (C.D.Ill.1989).[3]

---

**3.** The Court is mindful of the decision in *Butner v. United States*, 440 U.S. 48, 54, 99

S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), holding that the determination of property rights

When Congress uses a familiar legal expression and does not provide a definition, that connotes Congress' intent that the words be given their usual legal meaning. *One–Eighty Invs., Ltd. v. First Int'l Bank of San Antonio, N.A. (In re One–Eighty Invs., Ltd.)*, 72 B.R. 35, 36–37 (N.D.Ill. 1987). Moreover, "[t]he law uses familiar legal expressions in their familiar legal sense." *Henry v. United States*, 251 U.S. 393, 395, 40 S.Ct. 185, 186, 64 L.Ed. 322 (1920); *Bradley v. United States*, 410 U.S. 605, 609, 93 S.Ct. 1151, 1154, 35 L.Ed.2d 528 (1973). If Congress intends for courts to use a different interpretive method to read terms in the Bankruptcy Code, courts should look to find some statutory indication of this intent. *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 221, 116 S.Ct. 2106, 2112, 135 L.Ed.2d 506 (1996) *citing Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501, 106 S.Ct. 755, 759–760, 88 L.Ed.2d 859 (1986) ("[t]he normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications." (citations omitted)).

The term political subdivision is not defined in the Bankruptcy Code, so we must look to the familiar legal definition of the term. A political subdivision is defined as: "[a] division of the state made by proper authorities thereof, acting within their constitutional powers, for purpose of carrying out a portion of those functions of state which by long usage and inherent necessities of government have always been regarded as public." BLACK'S LAW DICTIONARY 1159 (6th ed.1990) *(citing State*

*ex rel. Maisano v. Mitchell,* 155 Conn. 256, 263, 231 A.2d 539, 542 (Conn.1967)). Upon reading this definition, one might wonder whether the word "division" applies purely to geographic, divisions or also to departmental divisions. Examination of *Maisano* clarifies this. In dealing with a state statute which did not define the term political subdivision, *Maisano* held that

> "[t]he word 'state' means 'a body of people occupying a definite territory and politically organized under one government.' On this theory, the subdivision of a state would be a body of people less in number than the total number in the state, politically organized, and occupying a part of the territorial area of the state hence a city, borough or town."

*Maisano,* 155 Conn. at 263, 231 A.2d at 542 *(citing City of Norwalk v. Daniele,* 143 Conn. 85, 119 A.2d 732 (Conn.1955) (further citations omitted)).

Clearly the Department is nothing like a city, borough or town. Rather, the Department is an administrative agency, i.e. it is a department of the state. An administrative agency is defined as: "[a] governmental body charged with administering and implementing particular legislation. Examples are … tax commissions …. In addition to 'agency', such governmental bodies may be called commissions, corporations (*e.g.* F.D.I.C.), boards, *departments,* or divisions." BLACK'S LAW DICTIONARY 45 (6th ed.1990) (emphasis added). In fact, the State of Minnesota has designated by law that "[t]he following agencies are designated as the departments of the state government: … the department of revenue …." MINN. STAT. ANN. § 15.01 (West 2000).

Furthermore, the legislative history behind 11 U.S.C. § 362(b)(18) shows that

---

in the assets of a bankrupt's estate is left to state law. But this instant issue involves discerning the meaning of words in a federal

statute and also examining exceptions to the automatic stay, not the determination of property rights per se.

Congress intended for this exception to the stay to apply only to local governments. There is no mention whatsoever of any sort of stay exception for state agencies in the legislative history:

> *Local governments* rely on real property taxes to constitute one of their principal sources of revenue.... However, several circuit courts have held that the automatic stay prevents *local governments* from attaching a statutory lien to property taxes accruing subsequent to a bankruptcy filing. See, e.g. *In re Parr Meadows Racing Assn.*, 880 F.2d 1540 (2d Cir.1989), cert. denied, 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990); *Makoroff v. City of Lockport,* 916 F.2d 890 (3d Cir.1990). These decisions create a windfall for secured lenders, who would otherwise be subordinated to such tax liens, and significantly impair the revenue collecting capability of *local governments.* This section overrules these cases and allow [sic] *local governments* to utilize their statutory property tax liens in order to secure the payment of property taxes.

H.R. REP. No. 103–834, at 58–59 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3367–68 (emphasis added).[4]

Scholarly analysis of 11 U.S.C. § 362(b)(18) also supports the conclusion that its exception to the automatic stay applies only to political subdivisions of a state.

> The legislative history offers no reason for treating ad valorem property taxes differently than it treats income taxes, or for treating local governments differently than it treats state governments and the federal government. In the absence of such a reasoned distinction, the distinction rests on unstated assumptions about the ability of government to absorb and spread costs.

Frances R. Hill, *Toward a Theory of Bankruptcy Tax: A Statutory Coordination Approach,* 50 TAX LAW. 103, 157 (1996). (Professor Hill also notes that "most commentators on bankruptcy tax have cautioned against permitting [tax] revenue considerations to interfere with the pursuit of bankruptcy objectives." *Id.* at 117 (citations omitted)).

Courts have consistently used the term political subdivision to refer to local communities, and not to state agencies. *See Reynolds v. Sims,* 377 U.S. 533, 575, 84 S.Ct. 1362, 1388, 12 L.Ed.2d 506 (1964) ("Political subdivisions of States—counties, cities, or whatever .... The relationship of the States to the Federal Government could hardly be less analogous."); *Lawson v. Shelby County, Tenn.,* 211 F.3d 331, 335 (6th Cir.2000) ("[S]ubdivisions of the state, such as counties and municipalities, are not protected by the Eleventh Amendment."); *R. Mayer of Atlanta, Inc. v. City of Atlanta,* 158 F.3d 538, 546 (11th Cir.1998) ("By withholding the authority to enact safety and insurance regulations from political subdivisions, Congress ensured that counties and municipalities would not enact differing (and perhaps inconsistent) sets of safety and insurance ordinances."); *Ohio Mfrs.' Ass'n v. City of Akron,* 801 F.2d 824, 829 (6th Cir.1986) ("As to the first argument, that 'states' necessarily includes their political subdivisions ... Congress

---

4. Conceivably, Respondents might point out that a portion of the tax liability secured by the liens was earmarked for local counties. That is ·irrelevant. It might be a different issue if the local counties had themselves filed liens and sent the multiple demands for payment. But that issue is not before the Court.

All the actions in violation of the stay in this case were taken by Respondents who acted on behalf of the Department. Consequently, the exception to the stay for local governments provided by 11 U.S.C. § 362(b)(18) simply does not apply here.

has expressly preempted 'states and their political subdivisions' from regulating.") (citations omitted).

It is true that the term state has been interpreted to include political subdivisions. *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 607–08, 111 S.Ct. 2476, 2483, 115 L.Ed.2d 532 (1991). "The exclusion of political subdivisions cannot be inferred from the express authorization to the 'State[s]' because political subdivisions are components of the very entity the statute empowers." *Id.* at 608, 111 S.Ct. at 2483. But that does not mean that a state agency is a political subdivision, and this Court is unaware of any authority suggesting otherwise.

Other courts take a narrow view of the ruling in *Mortier. Mortier* "falls short of establishing a rule that the word 'state' must be interpreted to include political subdivisions in all circumstances." *R. Mayer,* 158 F.3d at 547. The Sixth Circuit has quite recently recognized the distinction between states and political subdivisions. *Petrey v. City of Toledo,* No. 99–4441, 2001 WL 310320, at *10 (6th Cir. Apr.2, 2001) ("Applying this presumption in this case, we hold that, while states may regulate the safety of motor carriers, political subdivisions may not."). Furthermore, a county is "a part of a state only in that remote sense in which any city, town, or other municipal corporation may be said to be part of the state." *Lincoln County*

*v. Luning,* 133 U.S. 529, 530, 10 S.Ct. 363, 363, 33 L.Ed. 766 (1890) (citation omitted).

Given that it is beyond dispute that the Department is not a political subdivision of a state, it is clear that the actions of Respondents and their agents in demanding collection and filing liens do not fall under the exception to the stay found in 11 U.S.C. § 362(b)(18). It is important to note that, while some [5] of the funds assessed under the tax are paid to local counties, the relevant actions in this case were not taken by those local counties. Rather, they were acts carried out by Respondents on behalf of the Department, a state agency. Thus, Respondents' actions were clearly performed on behalf of the state itself, and not one of its political subdivisions.

██ However, even if Respondents' actions were somehow found to be on behalf of a political subdivision of the state, 11 U.S.C. § 362(b)(18) would still not excuse Respondents' actions from the stay. This is because Minnesota's taconite production tax is not an ad valorem tax. Section 362(b)(18) only provides an exception to the automatic stay for "the creation or perfection of a statutory lien for an ad valorem property tax ...." By its plain language, 11 U.S.C. § 362(b)(18) does not provide an exception to the stay for any other types of taxes. It does not provide an exception to the stay for production taxes or for excise taxes. Nor does it provide an exception to the stay for prop-

5. After certification by the Commissioner, some of the monies collected under the tax are allocated to cities, towns and school districts. But a substantial portion of the funds collected is not allocated to political subdivisions. These funds are allocated to the State of Minnesota's Iron Range Resources and Rehabilitation Board, the Minnesota Economic Protection Trust Fund, the Taconite Economic Development Fund and the Taconite Environmental Fund. Minn. Stat. Ann. § 298.28 (West 2000). Clearly, these state boards and state funds are not political subdivisions. Additionally, when the taxpayer is a debtor in bankruptcy, a full 50% of the payments received are distributed to two of these funds. Subdivision 15 of Minn. Stat. Ann. § 298.28 (West 2000) provides that 25% of the payment be distributed to the "northeast Minnesota economic protection trust fund" and an additional 25% be paid to the "taconite environmental protection fund."

erty taxes which are not ad valorem taxes.[6]

Minnesota's taconite production tax is levied annually. The amount of tax due is unrelated to the value of the taconite pellets. Instead, the tax is calculated at a flat rate. This flat rate is determined by multiplying the average tonnage of taconite produced by the Gross Domestic Product Implicit Price Deflator, published by the U.S. Department of Commerce. The tax rate for tax year 2000 was $2.173 per ton. (Respondents' Memorandum in Opposition to LTV's Motion to Enforce Stay at 3.) The tax is determined by multiplying the average tonnage produced over a three year period by the tax rate for that tax year. MINN. STAT. ANN. § 298.24 (West 2000).

At the hearing, counsel for Respondents placed great emphasis upon their assertion that the taconite production tax is assessed in lieu of property taxes. MINN. STAT. ANN. § 298.25 (West 2000). Respondents also cited several cases from the Minnesota courts. Before addressing the Minnesota cases that Respondents cite, the Court wishes to make it absolutely clear that the issue of whether under 11 U.S.C. § 362(b)(18) a tax is ad valorem is an issue of federal law. It is not an issue of state law. Whether or not Minnesota's courts and legislature deem the taconite production tax to be a property tax is not determinative, for the Court examines the meaning of the term ad valorem pursuant to the Bankruptcy Code.

■■■ The issue of whether an obligation is a tax is a federal question. *City of N.Y. v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941). In *Feiring*, the Supreme Court placed no weight on New York's label of "tax," and instead looked to the state statute only "to ascertain whether its incidents are such as to constitute a tax within the meaning of § 64." *Id.* at 285, 61 S.Ct. at 1029. "Analyzing the contours of these involuntary [tax] burdens ... rather than settling on the particular label for the exaction has remained the Court's focus in applying the *Feiring* definition." *United Mine Workers 1992 Benefit Plan v. Rushton (In re Sunnyside Coal Co.)*, 146 F.3d 1273, 1276 (10th Cir.1998) (citations omitted). Similarly, " 'labels imposed by state law are not controlling' when determining what constitutes a 'tax.' " *Or. Dep't of Transp. v. Arrow Transp. Co. of Del. (In re Arrow Transp. Co. of Del.)*, 229 B.R. 456, 459 (D.Or.1999) (*quoting Indus. Comm'n of Ariz. v. Camilli (In re Camilli)*, 94 F.3d 1330, 1331 (9th Cir.1996)).

State law labels upon a tax are not controlling for the purposes of federal bankruptcy law. *Camilli*, 94 F.3d at 1331. When a federal court seeks to determine whether a "tax" is actually a tax for bankruptcy purposes, the court looks behind the tax's label and examines the operation of the provision. *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. at 220–221, 116 S.Ct. at 2111.

In *Yoder v. Ohio Bureau of Workers' Comp. (In re Suburban Motor Freight, Inc.)*, 998 F.2d 338 (6th Cir.1993), the Sixth Circuit examined the issue of whether unpaid workers' compensation premiums owed to the state were taxes under the bankruptcy code. The Sixth Circuit held that "[t]he question is one of Federal law; state characterizations of workers' compensation premiums, whether judicial or legislative, have no binding effect on how such premiums must be characterized for bankruptcy purposes." *Id.* at 340.

6. In their Memorandum, Respondents use the term "ad valorem property tax" and "property tax" interchangeably. These terms should not be used interchangeably. Not all property taxes are ad valorem taxes.

Unfortunately the term ad valorem is not defined in the Bankruptcy Code. So we must look to other sources to ascertain its meaning. Black's Law Dictionary defines ad valorem tax as: "According to value. A tax imposed on the value of property. The more common ad valorem tax is that imposed by states, counties, and cities on real estate.... A tax levied on property or an article of commerce in proportion to its value, as determined by assessment or appraisal." BLACK'S LAW DICTIONARY 51 (6th ed.1990) *(citing Callaway v. City of Overland Park,* 211 Kan. 646, 508 P.2d 902, 907 (Kan.1973)). *See also Cass County v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 113, 118 S.Ct. 1904, 1910, 141 L.Ed.2d 90 (1998) (distinguishing between an ad valorem tax on land versus an excise tax on a transaction); *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,* 502 U.S. 251, 266–70, 112 S.Ct. 683, 692–94, 116 L.Ed.2d 687 (1992) (distinguishing between ad valorem taxes on property versus specific taxes upon property sales); *Ark. Corp. Comm'n v. Thompson,* 313 U.S. 132, 143, 61 S.Ct. 888, 890, 85 L.Ed. 1244 (1941).

In its definition of ad valorem, Black's Law Dictionary also notes that duties are either ad valorem or specific. Duties imposed on property based on a percentage of the value of property are ad valorem. Duties "imposed as a fixed sum on each article of a class without regard to its value[ ]" are specific. BLACK'S LAW DICTIONARY 51 (6th ed.1990). Clearly, the tax in this case is a specific tax. It is imposed by the Department as a fixed sum multiplied by the quantity of taconite produced. This fixed-rate tax takes no account whatsoever of the actual value of the taconite. A tax which is calculated at a flat rate per ton simply is not an ad valorem tax.

The *Callaway* court examined a municipal tax imposed upon rental properties. The court noted that "[a]n ad valorem tax is a tax imposed on the basis of the value of the article or thing taxed. An excise tax is a tax imposed on the performance of an act, the engaging in an occupation or the enjoyment of a privilege." *Callaway,* 211 Kan. at 651, 508 P.2d at 907. The tax in *Callaway* was imposed at an annual rate of .0035 dollars per square foot. The court found that this tax was not imposed on the value of the living area rented. Rather, "[t]he use of square footage of living area rented is merely a means of measuring the amount of the occupational tax to be collected annually." *Id.* at 653, 508 P.2d at 909. Consequently, the court concluded that there was little question that the tax was not an ad valorem tax. *Id.* at 654, 508 P.2d at 910.

There is universal agreement among authorities and commentators that for a tax to be an ad valorem tax, a determination of value must be involved. *See USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272, 1286 (2nd Cir.1995) ("the town may levy assessments based on either an 'ad valorem basis,' meaning against property owners in proportion to the value of the property"); David M. Richardson, *"Just Value" or Just a Value—Florida's Imperial Property Appraiser,* 48 FLA. L. REV. 723 (1996) ("Ad valorem taxes are typically based on the fair market value of the taxed property (or, in some states, on a fixed percentage of fair market value ....")). Professor Richardson also notes that "There will always be valuation disputes in an ad valorem tax system.", *id.* at 736; Henry E. Smith, *Ambiguous Quality Changes from Taxes and Legal Rules,* 67 U. CHI. L. REV. 647, 660–69 (2000) (distinguishing taxes imposed on an ad valorem basis from taxes imposed on a per-unit basis; notes that ad valorem taxes create an incentive to drop features and

quality from the item taxed while specific per-unit taxes have the opposite result).

Furthermore, the legislative history and commentary on 11 U.S.C. § 362(b)(18) indicate that Congress intended for § 362(b)(18) to only provide an exception to the stay for ad valorem property taxes imposed upon real property. Congress did not intend for § 362(b)(18) to provide an exception to the stay for every conceivable tax scheme under the sun. Both of the cases overruled by 11 U.S.C. § 362(b)(18) involved ad valorem property taxes. *See Parr Meadows,* 880 F.2d at 1542 ("Specific provisions require that town assessors assess all real property located in their respective towns according to its condition ...."); *Makoroff,* 916 F.2d at 893–95. (While *Makoroff* never uses the term ad valorem, *Makoroff* makes it clear that the taxes assessed in that case were levied "upon the basis of the full valuation of the taxable real property"). *Id.* at 893.

Respondents cite *Erie Mining Co. v. Comm'r of Revenue,* 343 N.W.2d 261 (Minn.1984) as holding that the taconite production tax is a property tax which uses taconite production as a means of computing the value of the underlying property. Respondents argue that it is reasonable for Minnesota's Legislature to use taconite weight as a means of valuing mining land. It is true that *Erie Mining Co.* held that the taconite tax is a property tax. *Id.* at 266. Noting again that the Court is addressing a federal question and that state labels imposed upon taxes are not controlling on our analysis, the issue of whether the taconite tax is a property tax is not determinative. The important issue is whether the taconite tax is an ad valorem property tax.

Furthermore, a careful reading of *Erie Mining Co.* shows that the court created a legal fiction to hold that the tax was a property tax. ("We recognized in *Soo Line* that the gross earnings tax was not a true property tax. The court acknowledged that this was a legal fiction, but upheld its use as a method of measuring the property tax." *Id.* at 265–66 (citations omitted)). By creating this legal fiction, the court avoided addressing issues of double taxation, and the court also avoided having to subject the tax to a constitutional analysis. *Id.* at 266, 269. And even a casual reading of *Erie Mining Co.* reveals this citation to *State v. Fawkes,* 210 Minn. 587, 588–89, 299 N.W. 666, 667 (Minn.1941). "It is just as much a property tax as if it were assessed ad valorem." *Id.* at 589, 299 N.W. at 667. In short, *Erie Mining Co.* supports our conclusion that the taconite tax is not an ad valorem tax.

Respondents also cite *Pullman Co. v. Comm'r of Taxation,* 223 Minn. 96, 25 N.W.2d 838 (Minn.1947). Respondents claim that in *Pullman,* the Minnesota Supreme Court found that a franchise tax measured by net income was an ad valorem property tax. *Pullman* dealt with a franchise tax imposed upon a railroad. The tax imposed upon the "privilege of existing as a corporation" was measured by the corporation's net income for the year. *Id.* at 98, 25 N.W.2d at 840. *Pullman* argued that the franchise tax was an ad valorem tax because "it is obvious that the value of a franchise is largely determined by the profitableness ...." *Id.* at 101, 25 N.W.2d at 841. We note that the Supreme Court of Minnesota has criticized *Pullman* and its precedential value is suspect.

The case of The Pullman Co. v. Commr. of Taxation, Supra, contains a persuasive dissent by three members of the court as then composed in which the difference between a franchise tax and a property tax is clearly stated in the following language: ... "The Subject of an

ad valorem tax is property, and that of an excise tax is a right or privilege." *Reuben L. Anderson–Cherne, Inc. v. Comm'r of Taxation,* 303 Minn. 124, 129, 226 N.W.2d 611, 614 (Minn.1975) (citations omitted).

Although we need not decide whether the taconite tax is a property tax, we wish to point out that many characteristics and functions of the taconite tax distinguish it from the traditional ad valorem property taxes contemplated by 11 U.S.C. § 362(b)(18). The taconite tax is imposed at a flat rate per each ton of production. This is much more consistent with an excise tax than a property tax. An excise tax is "imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege." *N.D. Workers Comp. Bureau v. Voightman (In re Voightman),* 239 B.R. 380, 382–83 (8th Cir. BAP1999). Here the mining of taconite is taxed on a per unit basis. The taconite tax functions to tax: 1) performance of an act—mining, quarrying and producing taconite; 2) engaging in an occupation—mining; 3) enjoyment of a privilege—the right to mine. MINN. STAT. ANN. § 298.24 (West 2000).

Also, one of the objectives of the taconite tax is to provide "a tax incentive to be a steady producer. An erratic or declining producer receives tax disincentives since its tax obligation increases." *Erie Mining Co.,* 343 N.W.2d at 268. This is not a typical concern of property taxes. Moreover, this tax is not imposed on real property. It is a tax imposed upon taconite pellets that have been mined and weighed. MINN. STAT. ANN. § 298.24 (West 2000).

Yet another aspect of the taconite tax that is contrary to the traditional notion of a property tax is that the liability under the taconite tax attaches *in personam,* as opposed to the *in rem* attachment of traditional property taxes. Indeed, Respon-

dents conceded at the hearing that the taconite tax liability is *in personam.*

Really the only aspect of the taconite tax which gives it any relation whatsoever to a property tax is that it is imposed "in lieu" of traditional property taxes. MINN. STAT. ANN. § 298.25 (West 2000). Yet despite Respondents' arguments, in lieu of is not a synonym for the word equals. In lieu of means "[i]nstead of; in place of; in substitution of." BLACK'S LAW DICTIONARY 787 (6th ed.1990). An excise tax imposed in lieu of a property tax is still an excise tax. The legislative history envisions a stay exception for "real property taxes" upon which local governments rely. The plain language and legislative history of § 362(b)(18) do not mention—indeed do not anticipate—an exception to the stay for a state agency imposing a specific (flat rate) excise tax upon the act of mining. That a portion of the funds collected under the taconite tax are distributed in lieu of funds that would have been collected under a property tax does not magically change the taconite tax into a property tax.

In conclusion, we note that 11 U.S.C. § 362(b)(18)'s exception to the automatic stay does not apply here because Respondents' actions were not performed on behalf of a political subdivision of a state. Furthermore, we conclude that the taconite tax is not an ad valorem tax. In closing, we note that the interpretation of 11 U.S.C. § 362(b)(18) urged by Respondents is at odds with the plain meaning of the statute. Respondents' arguments are so contrary to the plain language of the statute that one might be tempted to think that Respondents referred to a law that is differently worded than 11 U.S.C. § 362(b)(18). Respondents seem to imagine that 11 U.S.C. § 362(b)(18) creates an exception to the automatic stay that is somewhat along the lines of an exception

for: "[T]he creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the filing of the petition[.]" Bankruptcy Reform Act of 2001, S. 420, 107th Cong. § 1225 (2001).

But that is not how 11 U.S.C. § 362(b)(18) reads today. Rather, that is a change proposed in the Bankruptcy Reform Act of 2001. *Id.* The Bankruptcy Reform Act of 2001 is pending in Congress. It is not the law today, and it may never become the law.[7]

We note that the changes under contemplation by Congress are materially different from how the statute reads today. Congress is contemplating replacing the words "political subdivision of a State" with the words "governmental unit." Also, Congress is considering modifying "ad valorem property tax" by adding the phrase "or a special tax or special assessment on real property whether or not ad valorem." We see this as tacit acknowledgment by Congress that the current law does not provide an exception to the stay for all governmental units. We also see this as a tacit acknowledgment by Congress that the current law does not provide a stay exception for the collection of taxes which are not ad valorem.[8]

### 7. *Violation of the Automatic Stay*

■ The automatic stay is created by 11 U.S.C. § 362, which provides:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ...

operates as a stay, applicable to all entities, of—

\* \* \* \* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate[.]

11 U.S.C. § 362(a)(3) and (4).

■ The key elements for application of the stay are "the existence of property of the estate and the enjoining of all efforts by others to obtain possession or control of property of the estate." *In re Phar–Mor, Inc.,* 152 B.R. 924, 926 (Bankr. N.D.Ohio 1993) *(quoting In re Golden Distribs., Inc.,* 122 B.R. 15, 19 (Bankr. S.D.N.Y.1990)). Courts have found willful violations of the stay when a creditor knows of the stay and violates it with an intentional act. *TranSouth Fin. Corp. v. Sharon (In re Sharon* ), 234 B.R. 676, 687 (6th Cir. BAP 1999). A creditor's belief that his intentional act would not violate the stay does not preclude the court's finding that the creditor's intentional act was willful. *Id.* at 687–88. This is because the creditor had the opportunity to seek permission from the bankruptcy court before taking actions that might violate the stay. *Id. at* 688. A creditor's good-faith belief that he had a right to the property is not relevant to whether his act was willful. *Goichman v. Bloom (In re Bloom* ), 875 F.2d 224, 227 (9th Cir.1989).

---

7. Of course, the Court recognizes that it cannot render an advisory opinion on the effect of pending legislation. In no way do we intend for speculation about pending legislation to be used as authority regarding the Bankruptcy Reform Act of 2001.

8. Even under this proposed legislation, a court would most likely still have to address the issue of whether the taconite tax is a tax on real property rather than an excise tax. But we obviously do not need to address this issue.

Under 11 U.S.C. § 541, the taconite mine and facilities became part of LTV's bankruptcy estate when the petitions were filed on December 29, 2000. *See* 11 U.S.C. § 541. Respondents mailed the "Notice and Demand for Immediate Payment and Jeopardy Collection" on January 10, 2001. Respondents mailed the "Notice of Jeopardy Assessment and Collection and Demand for Immediate Payment" on January 23, 2001. Respondents filed tax liens against LTV on January 10 and January 24, 2001. All of these actions were taken post-petition. Respondents did not seek permission from the Court before making demands and filing liens against LTV's property.

It is quite clear that Respondents had notice of LTV's bankruptcy filing. After all, in its January 12, 2001 "Statement of Grounds for Jeopardy," an attorney for the Department stated that

> [t]he grounds for filing the liens under the jeopardy collection authority of the Department of Revenue is [sic] that because of the taxpayer's bankruptcy proceedings, the Department determined there was a substantially reduced possibility of ever collecting the taxpayer's $14,885,000.00 taconite production tax liability unless liens were filed as quickly as possible.

(LTV's Memorandum to Enforce Stay, Exhibit 3.)

Accordingly, the Court finds that Respondents were aware of the automatic stay. Furthermore, it is beyond dispute that Respondents' intentionally filed the tax liens after the petition date. Consequently, the Court finds that Respondents willfully violated the automatic stay provided by 11 U.S.C. § 362.

## CONCLUSION

For the reasons stated above, the Court reaches the following conclusions: 1) LTV was not required to initiate an adversary proceeding to enforce the automatic stay; 2) LTV may not recover its costs and attorneys' fees pursuant to 11 U.S.C. § 362(h); 3) the Eleventh Amendment is not applicable in this proceeding as LTV is seeking prospective relief against state officers pursuant to *Young;* 4) permissive abstention under 11 U.S.C. § 1334(c)(1) is not appropriate; 5) Respondents' actions of mailing collection notices and jeopardy assessments to LTV violated the automatic stay but *Young* does not permit the Court to remedy those actions and 6) Respondents' actions of filing tax liens against LTV's property constituted a willful violation of the automatic stay and did not fall within any exception.

Because Respondents' violation of federal law is ongoing, the Court concludes that prospective, injunctive relief is warranted. Respondents are ordered to remove all tax liens filed against LTV after December 29, 2000, and are further enjoined from taking any further collection efforts against LTV. However, the Court declines to grant an award of costs and attorneys' fees to LTV. Accordingly, LTV's motion is sustained in part and overruled in part.

An appropriate order shall enter.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion entered this date, Respondents Matthew G. Smith, Commissioner of Revenue of the State of Minnesota, George K. Hoyum, Director, Special Taxes Division, Minnesota Department of Revenue, Donald H. Walsh, Manager, Minerals Tax Office, Minnesota Department of Revenue, and Lynn C. Willenbring, Director, Minnesota Collection Enterprise, Minnesota Department of Revenue, are ordered to remove or cause to be removed any and all tax liens that they

filed or caused to be filed against the property of LTV. Furthermore, Respondents are hereby enjoined from taking any further efforts to collect LTV's liability for any taconite production taxes absent prior authorization from the Court.

**IT IS SO ORDERED.**